Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Colegio de Abogados de Puerto Rico Por sí, representado por su Presidente, Arturo Luis Hernández González, y en Representación de sus miembros<br><br>        Peticionarios<br><br>                    v.<br><br>Estado Libre Asociado de Puerto Rico; Hon. Luis Fortuño Burset; Oficina de Administración de los Tribunales Hon. Sonia Ivette Vélez Colón<br><br>        Recurridos<br><br>John E. Mudd<br><br>        Interventor-Recurrente | Certiorari<br><br>2011 TSPR 36<br><br>181 DPR ____ |

Número del Caso: CC-2010-606

Fecha: 17 de marzo de 2011

Tribunal de Apelaciones:

        Región Judicial de San Juan Panel III

Panel Integrado por su presidenta, la Juez Bajandas Vélez, el Juez Cortés Trigo y el Juez Feliberti Cintrón

*Per Curiam*

Abogado de la Parte Peticionaria

                Lcdo. Guillermo Ramos Luiña
                Lcdo. Harry Anduze Montaño
                Lcda. Rosa Bell Bayron
                Lcda. Judith Berkan
                Lcdo. Guillermo Figueroa Prieto
                Lcdo. Rafael García López
                Lcdo. Manuel Torres Delgado
                Lcdo. Eduardo Villanueva Muñoz

Oficina de la Procuradora General

                Lcda. Irene Soroeta Kodesh
                Procuradora General

                Lcda. Leticia Casalduc Rabell
                Subprocuradora General

Abogado del Interventor Recurrido

                Por derecho propio

Materia: Entredicho Provisional, Injuction Preliminar y Permanente y Sentencia Declaratoria en torno a la Inconstitucionalidad de Ley Núm. 121 de 13 de octubre de 2009 y de la Ley Núm. 135 de 6 de noviembre de 2009

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

Materia: Entredicho Provisional, Injuction Preliminar y Permanente y Sentencia Declaratoria en torno a la Inconstitucionalidad de Ley Núm. 121 de 13 de octubre de 2009 y de la Ley Núm. 135 de 6 de noviembre de 2009

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Colegio de Abogados de Puerto Rico por sí, representado por su Presidente, Arturo Luis Hernández González, y en representación de sus miembros<br><br>Peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico; Hon. Luis Fortuño Burset; Oficina de Administración de los Tribunales y Hon. Sonia Ivette Vélez Colón<br><br>Recurridos<br><br>John E. Mudd<br><br>Interventor-Recurrente | CC-2010-606 |

RESOLUCIÓN

En San Juan, Puerto Rico, a 17 de marzo de 2011.

A la solicitud de *certiorari* del Colegio de Abogados de Puerto Rico, no ha lugar.

La Ley Núm. 121 de 13 de octubre de 2009 y la Ley Núm. 135 de 6 de noviembre de 2009 son un ejercicio válido de la facultad constitucional de la Asamblea Legislativa. Tal y como razonó el Tribunal de Apelaciones, éstos no son estatutos de proscripción. Estas leyes no son otra cosa que el ejercicio por la Asamblea Legislativa de su facultad para regular la estructura y funcionamiento del Colegio de Abogados, las mismas facultades que la Asamblea Legislativa empleó al crear el Colegio mediante la Ley Núm. 43 de 14 de mayo de 1932. Fue esa ley de 1932, y no este Tribunal, la que creó el Colegio de Abogados e hizo compulsoria su membresía.

Ninguna de esas leyes usurpó el poder de este Tribunal para reglamentar la profesión de la abogacía en Puerto Rico. Tampoco conflige con lo que hemos pautado al respecto. La variación de la colegiación -de obligatoria a voluntaria- no elimina el Colegio, no contradice ninguna pauta establecida en el ejercicio de nuestro rol

como ente que reglamenta la profesión legal ni soslaya el axioma de separación de poderes, base de nuestro sistema republicano de gobierno. Véase, Colegio de Abogados de P.R. v. Schneider, 112 D.P.R. 540, 546 (1982) (La preeminencia de la acción judicial en este campo no significa que es nula la legislación al respecto que no contradiga las pautas que este Tribunal haya dictado).

La colegiación voluntaria tampoco está en tensión con el derecho constitucional a la libertad de asociación. Const. P.R., Art. II, Sec. 6. Por el contrario, es la colegiación compulsoria de una clase profesional la que crea una fricción inevitable con la libertad de asociación de los afectados. Por ello, esa limitación significativa de la libertad a no asociarse es constitucional solamente si el Estado demuestra un interés gubernamental apremiante que la hace necesaria. E.g., NAACP v. Button, 371 U.S. 415, 438 (1963)(descripción de este escrutinio).[1]

_____

[1] La norma según la Primera Enmienda de la Constitución de Estados Unidos se ha resumido así:

"*A court must conduct a balancing analysis to determine the legitimacy of a regulation that infringes upon a constitutional right. Courts weigh the regulatory burdens placed on individuals' rights against state interests that the regulation seeks to promote. When the regulation imposes severe burdens on the aggrieved party's rights, a court strictly scrutinizes the asserted state interest.*

*Under a strict scrutiny analysis, the state must narrowly tailor the regulation to meet compelling state interests. Courts undertake a less exacting review when the regulation imposes only minimal burdens on constitutional rights. This intermediate scrutiny only requires the state to assert important, but not necessarily compelling, state interests to justify the regulation.*

*Because freedom of association is a fundamental right, courts often require applying strict scrutiny analysis to laws that infringe upon it. Courts, however, do not always apply strict scrutiny, especially when the law imposes only minimal burdens on individuals' or political parties' rights. As a result, courts focus their analysis on how much the state's regulation burdens associational rights in order to determine which level of*

Ahora bien, toda vez que la legislación que nos ocupa va dirigida a hacer voluntaria la membresía en el Colegio de Abogados de Puerto Rico y que no se ha coartado el libre ejercicio de expresión de la organización, que reconocimos en Colegio de Abogados de P.R. v. Schneider, supra, no es necesaria nuestra intervención en este asunto. Las leyes impugnadas garantizan el ejercicio libre de los derechos constitucionales de expresión y asociación de todas las partes en este caso.

En cambio, se ordena la publicación de la sentencia unánime del Tribunal de Apelaciones de 18 de mayo de 2010, objeto de este recurso, Panel integrado por su Presidenta, la Juez Bajandas Vélez y los Jueces Cortés Trigo y Feliberti Cintrón. Esa sentencia expone de manera correcta el derecho aplicable.

Notifíquese por teléfono y fax, y por la vía ordinaria.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton emitió un Voto disidente. La Jueza Asociada señora Fiol Matta disiente de la decisión tomada por la mayoría del Tribunal y expediría el recurso por los motivos expresados tanto en el Voto disidente del Juez Presidente señor Hernández Denton como en el Voto particular disidente de la Juez Asociada señora Rodríguez Rodríguez. La Juez Asociada señora Rodríguez Rodríguez emitió un Voto particular disidente.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

---

*scrutiny to apply.*" Note: Clingman v. Beaver: Shifting Power from the Parties to the States, 40 U.C. Davis L. Rev. 1935, 1941-1944 (2007) (escolios omitidos).

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE SAN JUAN
PANEL III

| | | |
|---|---|---|
| Colegio de Abogados de Puerto Rico, por sí, representado por su Presidente Arturo Luis Hernández González y en representación de sus Miembros<br><br>RECURRIDO<br><br>v.<br><br>**Estado Libre Asociado de Puerto Rico, Hon. Luis Fortuño Burset,** Oficina de Administración de los Tribunales y Hon. Sonia Ivette Vélez Colón<br><br>PETICIONARIOS<br><br>John E. Mudd<br><br>INTERVENTOR-PETICIONARIO | KLCE201000212<br>KLCE201000247 | *Certiorari* procedente del Tribunal de Primera Instancia<br><br>Sala de San Juan<br><br>CASO NÚM.:<br>KPE2009-5316 (907)<br><br>SOBRE:<br>Entredicho Provisional, Injunction Preliminar y Permanente y Sentencia Declaratoria en torno a la Inconstitucionalidad de Ley Núm. 121 de 13 de octubre de 2009 y de la Ley Núm. 135 de 6 de noviembre de 2009 |

Panel integrado por su presidenta, la Juez Bajandas Vélez, el Juez Cortés Trigo y el Juez Feliberti Cintrón.

*Per Curiam*

**SENTENCIA**

En San Juan, Puerto Rico, a 18 de mayo de 2010.

Los peticionarios recurren de la Resolución dictada por el Tribunal de Primera Instancia, Sala de San Juan (TPI), el 10 de febrero de 2010, notificada al día siguiente. Mediante la misma, se denegaron las mociones de

**TS 29**

desestimación y sentencia sumaria presentadas por los peticionarios.

Analizados los escritos de las partes y los documentos anejados a los mismos, resolvemos expedir el auto de *certiorari* solicitado y revocar el dictamen recurrido.

I.

El 22 de diciembre de 2009 el recurrido, Colegio de Abogados de Puerto Rico, por sí, representado por su Presidente Arturo Luis Hernández González y en representación de sus Miembros (el recurrido o el Colegio), presentó una acción titulada Petición en el TPI (la Petición) contra el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Luis Fortuño Burset, el Estado Libre Asociado de Puerto Rico (el Estado), la Oficina de Administración de los Tribunales y la Directora Administrativa de los Tribunales, Hon. Sonia Ivette Vélez Colón (la Directora Administrativa). En síntesis, solicitó que se emitieran los recursos extraordinarios de entredicho provisional, interdicto preliminar e *injunction* permanente para prohibir la implantación de las Leyes Núms. 121 de 13 de octubre de 2009 (la Ley 121) y 135 de 6 de noviembre de 2009 (la Ley 135) (en conjunto, las Leyes) y se dictara sentencia declaratoria en la cual se decretara que las Leyes eran inconstitucionales.

El recurrido dividió sus alegaciones en la Petición en ocho (8) reclamaciones. En éstas sostuvo que las Leyes eran inconstitucionales por los siguientes fundamentos: 1) por violar las cláusulas constitucionales sobre el "Bill of Attainder"; 2) por usurpar el poder inherente que el Tribunal Supremo de Puerto Rico (Tribunal Supremo) posee para reglamentar la profesión de la abogacía; 3) por violar el principio de separación de poderes y pretender revocar, mediante *fiat* legislativo, las decisiones judiciales de Schneider I y Schneider II; 4) por incumplir varios requisitos sobre la redacción y el trámite de las leyes; 5) por violar los derechos de libertad de expresión y asociación del Colegio; 6) infringir los derechos de libertad de expresión y libertad de asociación de los miembros del Colegio; 7) violar el derecho del Colegio a la igual protección de las leyes por carecer de un nexo racional entre la medida legislativa y un fin legítimo del Estado; y 8) menoscabar la relación contractual entre el Colegio y sus miembros. Además, el mismo día el recurrido presentó una "Moción y Memorando de Derecho en Apoyo a Solicitud Urgente de Entredicho Provisional y Vista de Injunction Preliminar".

El 23 de diciembre de 2009 el TPI emitió una Orden y Citación. En la misma dispuso que: no expedía el entredicho provisional; citaba a las partes a una audiencia sobre *injunction* preliminar y permanente para el

**TS 31**

14 de enero de 2010; las partes tenían que reunirse en o antes de 8 de enero de 2010 para redactar un documento conjunto en el que incluyeran estipulaciones de hechos, identificaran los documentos y la prueba que se proponían utilizar en la audiencia e identificaran las controversias de derecho; y que el documento conjunto indicado y cualquier moción dispositiva debía presentarse en o antes de 13 de enero de 2010. El 23 de diciembre de 2010 el Estado fue emplazado y se le entregó copia de la Petición y la Orden y Citación.

El 28 de diciembre de 2009 el Lic. John E. Mudd (el interventor) presentó una moción en la que solicitó intervención o, en la alternativa, que se le permitiera presentar un alegato en calidad de *Amicus Curiae*. Mediante orden de 14 de enero de 2010, notificada el día 20 siguiente, el TPI permitió su intervención.

El 30 de diciembre de 2009 el recurrido presentó dos mociones. Pidió que se emitiera una orden urgente a los fines de que la parte demandada presentara su contestación a la Petición en o antes de 4 de enero de 2010 y una orden y citación a las Oficinas de los Presidentes y la Secretarías de los Cuerpos Legislativos para que produjeran ciertos documentos en o antes de 4 de enero de 2010.

El 13 de enero de 2010 el recurrido y el Estado presentaron un "Documento Conjunto en Cumplimiento de

**TS 32**

Orden" (Documento Conjunto). En éste incluyeron las siguientes estipulaciones:

1. Mediante la Ley Núm. 43 de 14 de mayo de 1932 (en adelante "Ley Núm. 43") se crea bajo el nombre de Colegio de Abogados de Puerto Rico una entidad jurídica o corporación cuasi pública.

2. El Artículo 3 de la Ley Núm. 43, previo a ser enmendada, disponía el requisito de afiliación obligatoria al Colegio para ejercer la profesión de abogado en el Estado Libre Asociado.

3. El 13 de octubre de 2009, se aprobó el Proyecto de la Cámara Núm. 152, convirtiéndola en la Ley Núm. 121 (en adelante, "Ley Núm. 121").

4. El 6 de noviembre de 2009, el Gobernador Luis G. Fortuño Burset firmó el Proyecto del Senado Núm. 338, promulgándose así la Ley Núm. 135 (en adelante, "Ley Núm. 135").

5. El Colegio de Abogados de Puerto Rico (en adelante "el Colegio") es una entidad jurídica con capacidad de demandar y ser demandada.

6. El Recurrido Luis Fortuño Burset es el Gobernador del Estado Libre Asociado de Puerto Rico y es responsable de cumplir y hacer cumplir las leyes promulgadas por el Estado Libre Asociado de Puerto Rico, incluyendo, la Ley Núm. 121, según enmendada por la Ley Núm. 135.

7. La Oficina de Administración de Tribunales (en adelante "OAT") es una entidad creada por ley para asistir al Juez Presidente del Tribunal Supremo de Puerto Rico en la administración del sistema judicial del País y es responsable de hacer cumplir los procedimientos administrativos establecidos para asegurar uniformidad, continuidad y eficiencia en la

**TS 33**

prestación de los servicios de la Rama Judicial, evaluar el impacto en el sistema de las medidas legislativas que pueden afectarlo y representar legalmente a la Rama Judicial.

8. La Hon. Sonia Ivette Vélez Colón, como Directora Administrativa de la Oficina de Administración de Tribunales, asiste al Juez Presidente en materia de la administración y funcionamiento de los tribunales en el País.

9. Una vez constituido el Colegio, los miembros aprobaron su Reglamento.

10. El Lcdo. Arturo Luis Hernández González es el Presidente del Colegio, quien fue electo como tal mediante el voto mayoritario de los miembros del Colegio que asistieron a la Asamblea General celebrada en el mes de septiembre de 2008.

11. El 4 de noviembre de 2008, los candidatos a la Gobernación y Comisaría Residente en Washington del Partido Nuevo Progresista fueron electos en las urnas.

12. El 2 de enero de 2009, la Hon. Liza Fernández Rodríguez presentó el P. de la C. 152, el cual fue referido a la Comisión de lo Jurídico y de Ética de la Cámara en esa misma fecha.

13. El 31 de marzo de 2009, la Comisión de lo Jurídico y de Ética de la Cámara rindió su Informe en torno al P. de la C. 152 recomendando su aprobación con enmiendas.

14. Al día siguiente, 1ro de abril de 2009, la Cámara de Representantes aprobó con enmiendas el P. de la C. 152 mediante 35 votos a favor y 15 votos en contra.

15. El Senado celebró vistas públicas sobre el P. de la C. 152 los días 25,

26 y 28 de agosto y 1 y 2 de septiembre de 2009.

16. El 13 de octubre de 2009, el Senado descargó el P. de la C. 152. La votación en el Senado fue 17 votos a favor y 8 en contra.

17. El 4 de febrero de 2009, el Presidente del Senado radicó el P. del S. 338.

18. El Senado no celebró vistas públicas en torno al P. del S. 338.

19. El 5 de marzo de 2009, el Senado descargó y aprobó el P. del S. 338 sin enmiendas con 27 votos a favor y 1 abstención.

20. El 19 de octubre de 2009, la Comisión de lo Jurídico y de Ética de la Cámara rindió un Informe sobre el P. del S. 338, en virtud del cual recomendó su aprobación con enmiendas.

21. Ese mismo 19 de octubre de 2009, la Cámara aprobó el P. del S. 338 con enmiendas mediante votación dividida de 32 votos a favor y 11 votos en contra.

22. El 26 de octubre de 2009, el Senado concurrió con las enmiendas de la Cámara mediante votación dividida de 19 votos a favor, 8 en contra y 1 abstención. Ese mismo día dispuso que fuese enrolado.

23. El día 6 de noviembre de 2009, el recurrido Fortuño Burset firmó el P. del S. 338, convirtiéndolo en la Ley Núm. 135 de igual fecha.

24. El 24 de noviembre de 2009, el Colegio presentó una Petición en Acción de Jurisdicción Original ante el Tribunal Supremo en la que impugnó la validez y constitucionalidad de las Leyes Núm. 121 y 135. Mediante Resolución dictada el 9 de diciembre de 2009, el Tribunal Supremo decidió no

**TS 35**

ejercer jurisdicción sobre la referida Petición.

25. La OAT ha comenzado a tomar pasos encaminados a cumplir con las disposiciones de la[s] Leyes 121 y 135.

26. El 5 de enero de 2010, el Tribunal Supremo de Puerto Rico dictó Resolución 2010 TSPR 1.

27. Se estipula la autenticidad del Reglamento del Colegio.

28. Se estipula que las siguientes ponencias fueron presentadas a la Comisión de lo Jurídico de la Cámara de Representantes:

    a. Oficina de Administración de los Tribunales

    b. Colegio de Abogados de Puerto Rico

    c. Colegio de Arquitectos y Arquitectos Paisajistas de Puerto Rico

    d. Departamento de Justicia

    e. José Julio Díaz

    f. Junta de Síndicos Facultad de Derecho Eugenio María de Hostos

    g. Lic. Alfredo Castellanos

    h. Lic. Carlos Mondríguez Torres

    i. Lic. John E. Mudd

    j. Lic. Maria Milagros Charbonier

    k. Lic. Rafael Sánchez Hernández

    l. Lic. Robert E. Schneider, Jr.

    m. Unión Americana de Libertades Civiles (ACLU)

    n. Lic. Luis Dávila Colón

**TS 36**

29. Se estipula que las siguientes ponencias fueron presentadas a la Comisión de lo Jurídico del Senado:

   a. Oficina de Administración de los Tribunales

   b. Alianza de Líderes Comunitarios de PR – Jorge Oyola

   c. Asociación Americana de Juristas Cap. Puerto Rico – Hiram Lozada

   d. Asociación de Industriales de PR – Lic. Roberto Monserrate Maldonado

   e. Asociación de Residentes Gladiolas Vive – Mirta Colón Pellecier

   f. Carmen Iris Pillot López

   g. Coalición Puertorriqueña contra la Pena de Muerte – Mariana Nogales

   h. Colegio de Abogados de Puerto Rico – Lic. Arturo Hernández González

   i. Colegio de Cirujanos Dentistas de Puerto Rico – Dr. Noel J. Aymat

   j. Colegio de Contadores Públicos Autorizados de Puerto Rico – CPA Rafael del Valle

   k. Colegio de Diseñadores-Decoradores de Interiores de PR – Sr. Roberto Lucena Zabala

   l. Colegio de Médicos Cirujanos de Puerto Rico – Dr. Eduardo Ibarra

   m. Colegio de Químicos de Puerto Rico – Dr. Roberto Trinidad Pizarro

   n. Colegio de Técnicos de Refrigeración y Aire Acondicionado de PR – Sr. Daniel Crespo

   o. Comisión de Abogados Jóvenes del CAPR – Lic. Jeremiah Ocasio

**TS 37**

p. Comisión de Derechos Civiles – Lic. Vance Thomas Rider

q. Consejo Interdisciplinario de Colegios y Asociaciones Profesionales – CICAP Sra. Marta Bravo Colunga

r. Delegación de Abogados de Aguadilla – Lic. Lissette Medina

s. Delegación de Abogados de Humacao – Lic. Waleska Delgado

t. Delegación de Abogados de Mayagüez – Lic. María del Carmen Gitany

u. Departamento de Justicia

v. Escuela de Derecho Eugenio María de Hostos – Lic. Orlando Portela Valentín

w. Escuela de Derecho Pontificia Universidad Católica de PR – Lic. Rosario del Pilar Fernández Vera

x. Escuela de Derecho Universidad de Puerto Rico – Lic. Guillermo Figueroa Prieto

y. Federación Americana de Abogados – Lic. George Harper

z. Federación Interamericana de Abogados, Cap. de PR – Lic. David Freedman

aa. Héctor R. Arroyo Aguilar – estudiante de derecho recién graduado

bb. Hermandad de Empleados Exentos No Docentes de la Universidad de Puerto Rico – Wigberto Jiménez Rivera

cc. Instituto de Notariado Puertorriqueño – Lic. Luis Colón Ramery

**TS 38**

dd. Jesús  García  Oyola  – representante  clientela Servicios Legales de PR

ee. Lic. Alfredo Castellanos

ff. Lic. Anelie Carlo Rivera

gg. Lic. Carlos del Valle Cruz – Centro de Paz y Justicia de las Américas

hh. Lic. Carlos Mondríguez Torres

ii. Lic. Carmelo Delgado Cintrón

jj. Lic. Celina Romany Siaca

kk. Lic. Doel Quiñones Nuñez – Catedrático de la Escuela de Derecho de la Universidad Interamericana

ll. Lic. Domingo Emanuelli

mm. Lic. Francis Daniel Nina Estrella

nn. Lic. Graciany Miranda Marchand

oo. Lic. Héctor Sostre Narváez – Tesorero de la Junta de Gobierno del Colegio de Abogados de PR

pp. Lic. John E. Mudd

qq. Lic. José E. González Borgos

rr. Lic. José Roberto Vega Díaz

ss. Lic. Julián Rivera Espinal (Comisión Caso Rosa Lydia Vélez vs. Depto. Educación)

tt. Lic. Luis E. Dubón III

uu. Lic. Manuel Quilichini

vv. Lic. Noel Colón Martínez – Presidente Comisión para el

**TS 39**

Estudio del Desarrollo Constitucional de Puerto Rico

ww. Lic. Aníbal Vega Borges

xx. Lic. Antonio Fernós López Cepero

yy. Lic. Osvaldo Toledo Martínez

zz. Lic. Samuel Quiñones García

aaa. María Esther Santiago Fuentes

bbb. Pro Bono Inc. - Lic. Antonio Vidal

ccc. Sociedad Puertorriqueña de Planificación - Sr. Arsenio D. Portu-Hamani

ddd. Unión de Abogados y Abogadas de Servicios Legales

30. Se estipula que los siguientes informes fueron descargados por la Cámara de representantes:

a. Informe de 31 de marzo de 2009 de la Comisión de lo Jurídico y de Ética en torno al P. de la C. 152.

b. Informe de 19 de octubre de 2009 de la Comisión de lo Jurídico y de Ética en torno al P. del S. 338.

Además, en el Documento Conjunto el recurrido alegó que existía controversia en cuanto a "las intenciones de la legislatura al aprobar las Leyes Núm. 121 y 135, las expresiones realizadas por la Legislatura y el Gobernador sobre el particular, los efectos nocivos de las Leyes Núm. 121 y 135 sobre el Colegio y sus miembros, las actividades realizadas por el Colegio desde el 1986 hasta el presente, las posiciones expuestas por el Colegio en sus

**TS 40**

comparecencias ante la ONU y las circunstancias que rodearon el alquiler de las facilidades del Colegio por parte de los familiares de Filiberto Ojeda Ríos para celebrar su velatorio".

Por su parte, el Estado alegó que la controversia planteada en el pleito era una estrictamente de derecho, por lo que sólo se requería analizar las leyes impugnadas y la jurisprudencia aplicable. Sostuvo que no había controversia en cuanto a que esas leyes fueron aprobadas válidamente y la controversia no requería la presentación de prueba.

En cuanto a las controversias de derecho, el recurrido reiteró las reclamaciones contenidas en la Petición. El Estado adujo que el recurso extraordinario solicitado era improcedente y reafirmó que la controversia de derecho se circunscribía a determinar si las referidas leyes eran constitucionalmente válidas.

De otra parte, el recurrido detalló catorce (14) testigos y doce (12) documentos que se proponía presentar en la audiencia. Por su parte, el Estado se reservó el derecho a utilizar cualquier documento o testigo anunciado por el recurrido.

Asimismo, el 13 de enero de 2010 el interventor y el Estado presentaron por separado mociones de desestimación. En la "Moción en Solicitud de Desestimación", el Estado alegó que acceder al pedido del recurrido implicaba

intervenir indebidamente con las funciones del Primer Ejecutivo y la Asamblea Legislativa, en contravención a la doctrina de separación de poderes. Indicó que la determinación realizada por la Legislatura en cuanto a la falta de justificación de la afiliación compulsoria obedeció a un análisis de juicio evaluativo y programático. Además, señaló que la Petición no era remediable mediante el recurso de *injunction* porque el Artículo 678 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3524, establecía que no podía dictarse un interdicto para impedir la aplicación u observancia de cualquier ley o el cumplimiento de cualquier actuación autorizada por la Asamblea Legislativa a menos que se hubiera determinado por sentencia final, firme, inapelable e irrevisable que dicha ley o actuación autorizada por ley era inconstitucional o inválida, lo que no había ocurrido. Igualmente, sostuvo que no se cumplían los requisitos para la expedición de un *injunction* porque no existía un daño irreparable y el recurrido no había demostrado las probabilidades de prevalecer ya que no procedía lo aducido en cada una de las reclamaciones incluidas en la Petición, según detalladamente discutió.

En el señalamiento de 14 de enero de 2010 el recurrido inició el desfile de su prueba con la

presentación de varios documentos.[1] El Estado objetó dicha prueba y las partes argumentaron sus posiciones. El TPI dejó sin efecto la continuación de la audiencia pautada para el 15 de enero de 2010 y le concedió al recurrido hasta el 19 de enero de 2010 para oponerse a la solicitud de desestimación del Estado.

El 19 de enero de 2010 el recurrido presentó una "Petición Enmendada y Suplementaria" (la Petición Enmendada). Además, el 21 de enero de 2010 presentó "Oposición a Solicitudes de Desestimación" y "Moción Para que se le Señale la Reanudación de Vista Consolidada de Injunction Preliminar y Permanente".

El 27 de enero de 2010 el interventor presentó "Moción de Sentencia Sumaria en Cuanto a Injunction Preliminar" y "Moción de Sentencia Sumaria en cuanto a los Méritos". No acompaño documento alguno con estas mociones.

Mediante Orden de 10 de febrero de 2010, notificada el día siguiente, el TPI declaró no ha lugar la moción de desestimación del Estado y las mociones de sentencia sumaria del interventor sin esbozar fundamento alguno. Además, permitió la Petición Enmendada, concedió al Estado y el peticionario hasta el 24 de febrero de 2010 para

---

[1] Como Exhibit 1 se presentó el Informe Positivo sobre el P. de la C. 152 de la Comisión de lo Jurídico y de Ética de la Cámara de Representantes y como Exhibit 2 las ponencias de la Directora Administrativa ante la Comisión de lo Jurídico y de Ética de la Cámara de Representantes de 27 de marzo de 2009 y la Comisión de Seguridad Pública y Asuntos de la Judicatura del Senado de 2 de septiembre de 2009.

contestarla y señaló la continuación de la vista para los días 1 al 4 de marzo de 2010.

El 19 de febrero de 2010 el interventor presentó ante nos el recurso de *certiorari* núm. KLCE201000212. Señaló que se cometieron los siguientes errores:

> Erró el TPI al denegar las mociones de desestimación y sentencia sumaria radicadas por los demandados y el interventor sobre los méritos de la Petición del Colegio.

> Erró el TPI al denegar las mociones de desestimación y de sentencia sumaria radicada por los demandados y el interventor sobre la procedencia del *injunction* preliminar.

Además, el interventor acompañó con su recurso una moción en auxilio de jurisdicción. Mediante Resolución del mismo día paralizamos los procedimientos ante el TPI y, como la orden recurrida carecía de los fundamentos necesarios para ejercer nuestra función revisora, le concedimos al TPI hasta el 26 de febrero de 2010 para que emitiera una Resolución en la cual incluyera los fundamentos para su decisión.

El 22 de febrero de 2010 el recurrido presentó "Moción Urgente para que se Deje sin Efecto y de Inmediato de Orden de Paralización de los Procedimientos y para que se Deniegue la Expedición del Auto de *Certiorari* por Falta de Jurisdicción". El día siguiente le concedimos término al interventor para expresarse.

**TS 44**

Por su parte, el 25 de febrero de 2010 el Estado presentó el recurso de *certiorari* núm. KLCE201000247. Señaló que se cometieron los siguientes errores:

Erró el Tribunal de Primera Instancia al rechazar la postura del Estado en torno a que en el caso de autos resulta improcedente el recurso extraordinario del *injunction* a los fines de declarar las leyes en controversia inconstitucionales.

Erró el Tribunal de Primera Instancia al no disponer sumariamente de una controversia, a pesar que la misma es de estricto derecho, estc es: si las leyes impugnadas son constitucionales.

Mediante Resolución de 25 de febrero de 2010, entre otras determinaciones, consolidamos los recursos de *certiorari* según lo solicitó el Estado y denegamos la moción urgente presentada por el recurrido. El 26 de febrero de 2010 el TPI emitió Resolución en Cumplimiento de Orden, pero, debido a que consideramos que la misma no cumplía con nuestra Resolución de 19 de febrero de 2010, dispusimos concederle un término adicional para que emitiera una Resolución en la que indicara los hechos en controversia y sus fundamentos para denegar las mociones de desestimación y sentencia sumaria.

El 8 de marzo de 2010 el TPI emitió Segunda Resolución en Cumplimiento de Orden. En la misma indicó, esencialmente, que las mociones de desestimación se habían convertido en inoficiosas porque se habían presentado antes de que se permitiera la Petición Enmendada y procedía que

el Colegio presentara su prueba sobre daño irreparable y violación de derechos constitucionales para poder resolver si procedía el remedio interdictal. Identificó unas catorce (14) controversias que, por entender que eran de hechos[2], impedían desestimar el pleito.[3]

---

[2] Las mismas son las siguientes:

(1) Si las Leyes 121 y 135 despojan o no al Colegio de Abogados de Puerto Rico de sus miembros.

(2) Si las Leyes 121 y 135 imponen o no un castigo al Colegio de Abogados de Puerto Rico dentro del significado tradicional de un castigo legislativo.

(3) Si la prohibición de recibir el dinero producto de la venta de sellos forenses le causan o no al Colegio de Abogados de Puerto Rico un daño que afecta su fondo para la provisión de asistencia legal a indigentes.

(4) Si las Leyes 121 y 135 le causan o no un daño al Colegio de Abogados de Puerto Rico al prohibirle a los municipios y otras entidades del ELA pagar la cuota de colegiación a sus empleados.

(5) Si las Leyes 121 y 135 tienen o no propósitos legislativos punitivos.

(6) Si las limitaciones impuestas por las Leyes 121 y 135 al Colegio de Abogados violan o no la separación de poderes de nuestro sistema republicano de gobierno.

(7) Si los historiales legislativos de las Leyes 121 y 135, que no han sido sometidos en su totalidad, evidencian o no una intención de castigar al Colegio de Abogados.

(8) Si las Leyes 121 y 135 usurpan o no el poder inherente del Tribunal Supremo de Puerto Rico para reglamentar la profesión de la abogacía en Puerto Rico.

(9) Si las Leyes 121 y 135 violan o no el derecho de libertad [de] expresión del Colegio de Abogados de Puerto Rico garantizado por la Constitución del Estado Libre Asociado de Puerto Rico y la Primera Enmienda a la Constitución de los Estados Unidos.

(10) Si las Leyes 121 y 135 violan o no el derecho de libertad de asociación del Colegio de Abogados de Puerto Rico garantizado por la Constitución del Estado Libre Asociado de Puerto Rico y la Primera Enmienda a la Constitución de los Estados Unidos.

(11) Si las Leyes 121 y 135 violan o no el derecho de libertad [de] expresión de los miembros del Colegio de Abogados de Puerto Rico garantizado por la Constitución del Estado Libre Asociado de Puerto Rico y la Primera Enmienda a la Constitución de los Estados Unidos.

(12) Si las Leyes 121 y 135 violan o no el derecho de libertad de asociación de los miembros del Colegio de Abogados de Puerto Rico garantizado por la Constitución del Estado Libre Asociado de Puerto Rico y la Primera Enmienda de la Constitución de los Estados Unidos.

(13) Si las Leyes 121 y 135 violan o no el derecho constitucional del Colegio de Abogados de Puerto Rico a la igual protección de las leyes garantizado por la Constitución del Estado Libre Asociado de Puerto Rico y la Quinta Enmienda y/o Decimocuarta Enmienda a la Constitución de los Estados Unidos.

(14) Si las Leyes 121 y 135 menoscaban o no la relación contractual entre el Colegio de Abogados y sus miembros.

[3] El TPI también indicó que en el expediente no existía estipulación alguna de las partes sobre los hechos. Sin embargo, según indicado, en el Documento Conjunto se incluyeron treinta (30) estipulaciones de hechos.

Mediante Resolución de 10 de marzo de 2010 concedimos a los peticionarios hasta el 16 de marzo de 2010 para suplementar sus recursos y al recurrido hasta el 23 de marzo de 2010 para fijar su posición. El interventor presentó su escrito el 15 de marzo y el Estado el día siguiente.

El 23 de marzo de 2010 el recurrido presentó "Escrito Fijando Posición". Mediante Resolución de 25 de marzo de 2010 concedimos al recurrido hasta el 30 de marzo de 2010 para informar su posición en cuanto a todos los planteamientos de los peticionarios. El recurrido presentó su escrito el 5 de abril de 2010. Resolvemos.

II.

Antes de examinar las reclamaciones del recurrido, es preciso evaluar el trámite procesal que ha seguido el caso en instancia. Según indicado, el TPI denegó la solicitud de entredicho provisional del recurrido e inició la celebración de la vista de *injunction* preliminar en la cual el Colegio comenzó el desfile de su prueba. Además, el TPI denegó las solicitudes de desestimación del Estado y el interventor por entender que existían controversias de hechos que ameritaban una vista en su fondo. Incidió al así proceder.

La Regla 10.2 (5) de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 10.2 (5), permite que una parte pueda solicitar la desestimación, de su faz, de una demanda,

cuando en ésta no se expone una reclamación que justifique la concesión de un remedio. Este tipo de moción procede cuando de un examen de las alegaciones se desprende que la parte demandante no tendría derecho a remedio alguno bajo cualesquiera hechos que puedan ser probados. Rivera v. Jaume, 157 D.P.R. 562, 584 (2002).

Al evaluar una solicitud de desestimación bajo la mencionada defensa, los tribunales deben aceptar como ciertas las alegaciones contenidas en la demanda y considerarlas de la manera más favorable a la parte demandante. García v. E.L.A., 163 D.P.R. 800, 814 (2005). De este modo, los tribunales tienen el deber de considerar, si a la luz de la situación más favorable al demandante y resolviendo toda duda a favor de éste, la demanda es suficiente para constituir una reclamación válida. Pressure Vessels P.R. v. Empire Gas, P.R., 137 D.P.R. 497, 505 (1994). El tribunal tiene facultad para dictar sentencia a base de una moción de desestimación basada en la citada Regla 10.2 (5) cuando de la misma no surge que exista controversia sustancial de hechos que requiera la celebración del juicio en su fondo. Montañez v. Hosp. Metropolitano, 157 D.P.R. 96, 102-104 (2002).

En el presente caso, el TPI decidió inicialmente celebrar la vista de *injunction* preliminar. Consideramos que tal curso de acción no era el correcto.

**TS 48**

Ciertamente, como bien aduce el recurrido, el citado Artículo 678 (3) del Código de Enjuiciamiento Civil no impide que en este caso pueda emitirse un interdicto antes de que se resuelva por sentencia firme que las Leyes son inválidas. _Pacheco Fraticelli_ v. _Cintrón Antonsanti_, 122 D.P.R. 229, 238 (1988); D. Rivé Rivera, _Recursos Extraordinarios_, 2da ed., San Juan, Programa de Educación Jurídica Continua Universidad de Puerto Rico Facultad de Derecho, 1996, págs. 61-62. No obstante, no puede dictarse un interdicto para impedir la aplicación de una ley si previamente no se ha resuelto que ésta no es válida, aunque esta determinación no sea firme como requiere el citado Artículo 678 (3), porque, de otro modo, se estaría impidiendo la aplicación de un estatuto válido. Como se sabe, una ley es y se presume constitucional hasta que se resuelva lo contrario. _Cerame-Vivas_ v. _Srio. de Salud_, 99 D.P.R. 45, 51 (1970).

Así, el TPI inicialmente debió adjudicar la sentencia declaratoria solicitada por el recurrido, conforme lo establecido en la Regla 59 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 59. La Regla 59.1 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 59.1, dispone que "[e]l Tribunal de Primera Instancia tendrá autoridad para declarar derechos, estados y otras relaciones jurídicas, aunque se inste o pueda instarse otro remedio". Además, la Regla 59.2 (a) de las de Procedimiento Civil,

32 L.P.R.A. Ap. III, R. 59.2 (a), establece que "[t]oda persona... cuyos derechos... fuesen afectados por un estatuto... podrá solicitar una decisión sobre cualquier divergencia en la interpretación o validez de dichos estatutos... y además que se dicte una declaración de los derechos, estado u otras relaciones jurídicas que de aquéllos se deriven".

En este sentido, el Tribunal Supremo reiteradamente ha resuelto que la sentencia declaratoria es el mecanismo adecuado para adjudicar controversias de índole constitucional. Suárez v. C.E.E. I, 163 D.P.R. 347, 354 (2004); Asoc. de Periodistas v. González, 127 D.P.R. 704, 723-724 (1991). Por lo tanto, inicialmente el TPI tenía que adjudicar la sentencia declaratoria y, de proceder la misma a favor del recurrido, dictar el remedio interdictal correspondiente.

Ciertamente, el TPI podía celebrar una vista evidenciaria si existían controversias de hechos para adjudicar la sentencia declaratoria. Regla 59.5 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 59.5. No obstante, como discutiremos, aceptando como ciertas las alegaciones del recurrido, no existen controversias de hechos que impida desestimar su reclamo y sólo se requiere adjudicar, como cuestión de derecho, la legislación impugnada por el Colegio es válida. Las controversias de hechos que el TPI indicó que le impedían

resolver las solicitudes de desestimación son, en su gran mayoría, controversias de derecho y las que no lo son, se refieren a controversias de hechos no materiales. Además, las alegaciones de la Petición son similares a las de la Petición Enmendada, por lo que al admitirse ésta no se convirtieron en inoficiosas las solicitudes de desestimación. Por lo tanto, procedían las solicitudes de desestimación y así debió disponer del pleito el TPI.

III.

A.

En la Primera Reclamación el recurrido alega que las Leyes 121 y 135 son inconstitucionales porque infringen las disposiciones de la Constitución de los Estados Unidos (Constitución Federal) que prohíben los estatutos de proscripción o leyes para condenar sin la celebración de juicio conocidas como *bills of attainder*.

El Artículo I, Sección 9, inciso 3 de la Constitución Federal dispone, en lo pertinente, que "[n]o Bill of Attainder or ex post facto Law shall be passed". Asimismo, el Artículo I, Sección 10, inciso 1 de la Constitución Federal establece, en parte, que "[n]o State shall… pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts…".

En nuestra jurisdicción el caso de <u>Pueblo</u> v. <u>Figueroa Pérez</u>, 96 D.P.R. 6, 9 (1968), es el único en el cual el Tribunal Supremo ha resuelto un cuestionamiento sobre la

validez de una ley bajo la disposición contra un estatuto de proscripción. El apelante alegó que la Sección 4 de la Ley Núm. 220 de 11 de marzo de 1948, conocida como Ley de Bolita (Ley 220), 33 L.P.R.A. sec. 1250, era un estatuto de proscripción según el Artículo 1, Sección 9, inciso 3 de la Constitución Federal y se rechazó su planteamiento.

El Tribunal Supremo explicó que un "estatuto de proscripción es una forma que utiliza el poder soberano para castigar a una persona designada por su nombre o a miembros determinables de un grupo de personas". Pueblo v. Figueroa Pérez, 96 D.P.R., a la pág. 9 (citando a United States v. Lovett, 328 U.S. 303 (1946)). Añadió que "[o]tra característica de tal estatuto es que se niega el derecho a un juicio en que las personas afectadas pudieran obtener una adjudicación de sus derechos". Id.

Conforme lo anterior, el Tribunal Supremo concluyó que, como la Ley 220 fue promulgada con el propósito de poner fin a un mal que permitía a individuos al margen de la ley explotar sin misericordia a las personas más necesitadas y exprimir cuantiosos beneficios monetarios, esta legislación no contenía disposición alguna que fuera de la naturaleza de un *bill of attainder*. Además, se indicó que en Pueblo v. Matías Castro, 90 D.P.R. 528 (1964), se había resuelto que la citada Sección 4 de la Ley 220 era constitucional.

De otra parte, en la jurisdicción federal, se ha resuelto que la cláusula constitucional contra un estatuto de proscripción prohíbe al Congreso aprobar una ley que legislativamente determine culpa e inflija castigo sobre un individuo en particular sin las garantías y protecciones de un juicio en su fondo. Nixon v. Administrator of General Services, 433 U.S. 425, 468 (1977).[4]

El caso que mejor refleja la intención original de la prohibición contra un estatuto de proscripción es Cummings v. Missouri, 71 U.S. 277 (1866). En éste, el Tribunal Federal indicó que un estatuto de proscripción es un acto legislativo que inflige castigo sin juicio e incluye cualquier acto legislativo que quite la vida, libertad o propiedad de una persona particular o grupo de personas porque el legislador los considera culpables de una conducta que merece castigo. Id., a la pág. 298. Así, concluyó que una ley que prohibía a las personas practicar

---

[4] En Nixon v. Administrator of General Services, el Tribunal Supremo Federal (Tribunal Federal) expresó que la interpretación que se le confiere a la prohibición de un estatuto de proscripción no puede ser llevada a tal extremo que se entienda que cualquier ley que imponga a un grupo o individuo soportar una carga que éstos detesten, deba ser considerada como un estatuto de proscripción. Razonó que argumentar que un individuo o un grupo definido es proscrito ("attainted") siempre que es obligado a soportar cargas las cuales desaprueban, eliminaría la relación entre la garantía constitucional contra dichas leyes y los conceptos realistas de clasificación y castigo y paralizaría el proceso legislativo porque cualquier individuo o grupo que sea el sujeto de legislación adversa podría quejarse de que los legisladores pudieron y debieron haber restringido a la clase afectada con un mayor grado de generalidad. Id., a la pág. 470. Además, expuso que, si bien la cláusula constitucional contra un estatuto de proscripción sirve como un importante baluarte en contra de la tiranía, no se logra dicho fin limitando a la Legislatura a solamente poder legislar para todos, aprobar leyes que sólo son beneficiosas o no legislar. Id., a la pág. 471.

ciertas profesiones, a menos que juramentaran que nunca habían pertenecido a organizaciones contra el Estado, era un castigo por anteriormente estar asociadas a la Confederación y violaba la cláusula constitucional contra un estatuto de proscripción. *Id.*, a la pág. 323.

Asimismo, en United States v. Lovett, 328 US, a la pág. 315, el Tribunal Federal expresó que un estatuto de proscripción prohíbe los actos legislativos, sin importar su forma, que aplican, ya sea a personas nombradas, como a los miembros fácilmente identificables de un grupo, de tal manera que se les cause castigo sin un proceso judicial. Conforme lo anterior, resolvió que una ley de confiscación de salarios a unos trabajadores del Estado que se les acusaba de ser comunistas era un estatuto de proscripción. *Id.*, a las págs. 315-316.

En algunos casos el Congreso ha impuesto un castigo a grupos cuyos miembros individuales se podían identificar sin mucha dificultad. Por ejemplo, en United States v. Brown, 381 U.S. 437 (1965), una ley federal estableció como delito para los miembros del Partido Comunista que sirvieran como oficiales de un sindicato. El propósito de la ley fue proteger la economía nacional, minimizando el peligro de las huelgas políticas. El Tribunal Federal invalidó la ley como un estatuto de proscripción porque no todos los miembros del Partido Comunista incitaron las huelgas políticas, también podrían incurrir en dicha

conducta rebeldes no comunistas y le correspondía a la Rama Judicial juzgar la culpabilidad de una persona particular (separación de poderes). Además, expresó que el castigo en un estatuto de proscripción sirve varios propósitos: retributivo, rehabilitativo, disuasivo y preventivo. *Id.*, a la pág. 458.

De un análisis de la jurisprudencia citada se puede concluir que la prohibición constitucional contra un estatuto de proscripción fue desarrollada para prevenir la supresión de las minorías que voluntariamente pertenecían a organizaciones con fines políticos mediante legislación. D. Kairys, *The Bill of Attainder Clauses and Legislative and Administrative Suppression of "Subversives"*, 67 Colum. L. Rev. 1490, 1499 (1967). En este sentido, se ha definido un estatuto de proscripción como:

> "… [L]egislation which imposes punishment in the broad sense explained in *Brown* without judicial trial upon people identified either as individual (by name or other distinctive characteristics) or as members, associates of or sympathizers with any voluntary organization having political goals. Courts should give 'political' a generous reading, bearing in mind the wide range of active and potentially active interest groups and the great variety of questions that can become involved in politics; 'political goals' need not be goals currently at the center of political debate... Their central vice, however, is that they arrogate to the legislature the functions of the judiciary, and thus deprive citizens of procedural

protections. _Id._, a la pág. 1499. (Énfasis suplido)."

En este caso, el recurrido sostiene que las Leyes 121 y 135 son estatutos de proscripción porque imponen al Colegio castigos sin juicio "al decretar la descolegiación automática de todos los abogados y abogadas, despojan al Colegio de sus miembros, prohíben al Colegio de promover 'en forma directa o indirecta, religión ni idea política alguna', impiden que el Colegio y cualquier otra entidad que esté relacionado al Colegio puedan recibir fondos provenientes de la venta de sellos y/o del Tribunal Supremo para la provisión de asistencia legal a indigentes en casos civiles y le proscriben a '[l]os departamentos, agencias, oficinas, entidades, instrumentalidades, corporaciones públicas o municipios del Gobierno de Puerto Rico… pagar o remitir pagos al Colegio de Abogados por concepto de cuotas u otros cargos por estar afiliados al Colegio de Abogados de Puerto Rico' mas le permiten a todas esas entidades públicas a pagar la cuota que el Tribunal Supremo tenga a bien fijar". Petición Enmendada, págs. 15-16. Acorde con lo anterior, aduce que las Leyes deben invalidarse porque son estatutos de proscripción. No le asiste la razón.

Según indicado, el estatuto de proscripción es un acto legislativo que impone un castigo sin juicio a una persona o grupo de personas que pertenecen voluntariamente

a una organización que tiene objetivos políticos. Kairys, *supra*, a la pág. 1499. Esta no es la situación del caso de autos.

Primeramente, el Colegio no es una organización voluntaria. Como se sabe, la Ley 43 estableció la afiliación compulsoria, no voluntaria, al Colegio de todos los abogados y abogadas para que pudieran ejercer la profesión legal en Puerto Rico. Artículo 3 de la Ley 43, 4 L.P.R.A. sec. 774.

Además, el Artículo 13 de la Ley 43, 4 L.P.R.A. sec. 772., impuso al Colegio las siguientes obligaciones:

1) Cooperar al mejoramiento de la administración de [la] justicia;

2) evacuar los informes y consultas que el Gobierno le reclame;

3) defender los derechos e inmunidades de los abogados...;

4) promover las relaciones fraternales entre sus miembros, y

5) sostener una saludable y estricta moral profesional entre los asociados.

Entre las funciones del Colegio se encuentran: la facultad de adoptar, con la aprobación del Tribunal Supremo, los Cánones de Ética Profesional que regirán la conducta de los abogados y abogadas; instituir procedimientos de desaforo ante esta Corte; crear montepíos, sistemas de seguros y fondos especiales; organizar una fundación "para instrumentar sus programas

de servicio a la comunidad y a la profesión"; y "ejercitar las facultades incidentales que fueren necesarias o convenientes a los fines de su creación…". Art. 2 de la Ley 43, 4 L.P.R.A. sec. 773; Colegio de Abogados v. Schneider I, 112 D.P.R. 540, 545 (1982).

De lo anterior surge que los propósitos principales para los cuales se creó el Colegio no fueron políticos, sino para promover el mejoramiento de la administración de la justicia, defender los derechos e inmunidades de los abogados y abogadas, enriquecer la profesión legal e instrumentar programas de servicio a la comunidad y a los abogados y abogadas. Véase, además, Colegio de Abogados v. Schneider II, 117 D.P.R. 504, 513-518 (1986). Por lo tanto, como el Colegio no es una organización creada con fines políticos, tampoco aplica la prohibición constitucional contra un estatuto de proscripción.

De todos modos, somos de la opinión que en el presente caso tampoco aplica la cláusula constitucional contra estatutos de proscripción porque las Leyes 121 y 135 no constituyen castigos punitivos al recurrido por su pasada conducta y expresiones. Veamos.

En primer lugar, la Exposición de Motivos de la Ley 121 revela que la Asamblea Legislativa entendió necesario que todos los miembros de la profesión legal gozaran de la misma representatividad en la entidad que los agrupa. Por ello, razonó que para propender al mejor desarrollo de la

**TS 58**

profesión legal en Puerto Rico no se justificaba la afiliación obligatoria de los abogados y abogadas al Colegio y ésta se cambió a una voluntaria.

Por su parte, la Ley 135 cambió el procedimiento de votación para elegir al Presidente y los delegados por acumulación y regionales de la Junta de Gobierno del Colegio y enmendó varias de las disposiciones de las Leyes 43 y 121 para concederle al Tribunal Supremo discreción para cobrar una cuota a los abogados y abogadas, fijar la cuantía de ésta, disponer las entidades a las que podían otorgarse los fondos devengados de dicha cuota y que las entidades públicas podían pagar la referida cuota al Tribunal Supremo.

En la Exposición de Motivos de la Ley 135 la Asamblea Legislativa reconoció que, por la naturaleza estatutaria del Colegio, resultaba necesario que éste fuera un foro representativo de la diversidad de ideas y pensamientos entre los abogados y abogadas y se respetaran las diferencias de criterios y opiniones en distintos aspectos. Asimismo, se destacó las necesidades de reevaluar los mecanismos vigentes que databan de 1932 para la selección del Presidente y los delegados por regiones y acumulación de la Junta de Gobierno y garantizar la participación de todos los abogados y abogadas que voluntariamente pertenecieran al Colegio en la toma de decisiones. Al concluir que el voto directo de los

colegiados era arcaico, obsoleto y antidemocrático, propuso un sistema de voto secreto mediante correo electrónico o correo regular.

Como vemos, las Leyes 121 y 135 no castigan al Colegio ni causan que desaparezca dicha entidad, sino que regulan la estructura y funcionamiento del Colegio y proveen los requisitos y procedimientos a seguir para aquellos abogados y abogadas que deseen afiliarse voluntariamente. El hecho de que las Leyes impugnadas enmendaran la ley que creó el Colegio y que algunos de sus miembros no estén de acuerdo con tal actuación, no significa que las enmiendas son estatutos de proscripción como alega el recurrido. Por lo tanto, concluimos que las Leyes 121 y 135 no son estatutos de proscripción y procedía desestimar la primera reclamación del Colegio.

B.

Por estar íntimamente relacionadas discutiremos en conjunto las alegaciones del recurrido en las Reclamaciones Segunda y Tercera. En éstas aduce que las Leyes violan la norma de la separación de poderes porque usurpan el poder inherente del Tribunal Supremo para reglamentar la profesión de la abogacía y se emiten órdenes e imponen deberes a éste. Asimismo, se alega que se pretenden revocar mediante "fiat legislativo las decisiones finales y firmes de Schneider I y Schneider II".

**TS 60**

El principio constitucional de separación de poderes emana de la Sección 2 del Artículo I de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, pág. 271. Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 89 (1998). En Silva v. Hernández Agosto, 118 D.P.R. 45, 57 (1986), el Tribunal Supremo expresó sobre este principio lo siguiente:

"… La teoría de la separación de poderes requiere que las facultades delegadas por el pueblo en la Carta Constitutiva se distribuyan entre las tres ramas. Su premisa es evitar la concentración de poder en una sola. La relación entre los poderes del Gobierno debe ser una dinámica y armoniosa. Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Su perdurabilidad requiere que cuando haya un conflicto sobre el alcance de los poderes constitucionales de cualquiera de ellas, los tribunales intervengan con prudencia y deferencia para aclarar los contornos de la Constitución y facilitar la resolución de las diferencias."

Dicho principio no pretende establecer una completa separación de poderes entre las tres ramas, sino un sistema de frenos y contrapesos que limita la acumulación desmedida de poder en una sola rama de gobierno. Colón Cortés v. Pesquera, 150 D.P.R. 724, 752 (2000). La división de los poderes legislativo, ejecutivo y judicial que establece nuestra Constitución no significa la independencia absoluta entre éstos. Misión Ind. P.R. v. J.P., 146 D.P.R., a la pág. 89. Lo que se persigue es un

**TS 61**

equilibrio dinámico y delicado entre poderes coordinados y de igual rango y evitar, así, que ninguno de éstos amplíe su autoridad a expensas de otro. Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 427-428 (1982). Se trata de un principio que debe aplicarse flexiblemente. Misión Ind. P.R. v. J.P., 146 D.P.R., a la pág. 112.

Por su parte, la Sección 17 del Artículo III de nuestra Constitución, L.P.R.A. Tomo 1, págs. 396-397, confiere a la Asamblea Legislativa la facultad de aprobar las leyes. Delgado, *Ex parte*, 165 D.P.R. 170, 193 (2005). Aún cuando se ha conferido a los tribunales la facultad de interpretar las leyes, éstos tienen la obligación de respetar la voluntad legislativa, incluso en aquellos casos en los cuales discrepen personalmente de la sabiduría de los actos legislativos. Por lo tanto, las cortes deben abstenerse de sustituir el criterio del legislador por sus nociones de lo justo, razonable y deseable. Cuevas v. Ethicon Div. J&J Prof. Co., 148 D.P.R. 839, 850 (1999).

Al interpretar el alcance de las leyes, los tribunales debemos siempre considerar cuáles fueron los propósitos legislativos para así garantizar su cumplimiento a la luz de los elementos que la motivaron. Es necesario tomar en cuenta que "[t]odo acto legislativo persigue un propósito, trata de corregir un mal, alterar una situación existente, complementar una reglamentación

vigente, fomentar algún bien específico o bienestar en general, reconocer o proteger un derecho, crear una política pública o formular un plan de gobierno, entre otros". Departamento de Hacienda v. Telefónica, 164 D.P.R. 195, 214 (2005). Como consecuencia, nuestra intervención será necesariamente limitada.

De otra parte, nuestra Constitución dispone, en su Artículo V, Sección 1, L.P.R.A., Tomo 1, pág. 411, que el Poder Judicial se ejercerá por el Tribunal Supremo y aquellos otros tribunales creados mediante legislación. Establece también que "[e]l Tribunal Supremo será el tribunal de última instancia en Puerto Rico". Art. V, Sec. 3, L.P.R.A. Tomo 1, pág. 412. En cuanto a la Rama Judicial, el principio de separación de poderes significa, en general, que la función judicial sólo puede realizarse por dicha Rama de Gobierno y las funciones no judiciales corresponden a los otros dos Poderes. Colón Cortés v. Pesquera, 150 D.P.R., a las págs. 752.

Como consecuencia del principio constitucional de la separación de poderes, el Tribunal Supremo ha reafirmado que la función de admitir y remover abogados y abogadas de la práctica es una de carácter inherentemente judicial, toda vez que es a la Rama Judicial a quien corresponde reglamentar la profesión legal. In re Carrasquillo Ortiz, 163 D.P.R. 589, 592 (1997); In re Soto López, 135 D.P.R. 642, 646 (1994). Así, en Ex parte Jiménez, 55 D.P.R. 54,

55 (1939), en ocasión de resolver una controversia presentada por treinta y nueve (39) personas que habían obtenido su diploma de abogado de la Universidad de Puerto Rico e impugnaban el requisito de aprobar el examen de reválida para ser admitidos al ejercicio de la profesión, el Tribunal Supremo expresó:

> "La admisión de una persona al ejercicio de la abogacía es una función de carácter puramente judicial. Entre las facultades inherentes a la rama judicial de nuestro Gobierno está la de delimitar los requisitos que deberán cumplir y las cualidades que deberán reunir los solicitantes de una licencia para ejercer como abogados ante sus tribunales."

De igual forma, se ha reiterado que la facultad para regular el ejercicio de la profesión de abogado en Puerto Rico corresponde única y exclusivamente al Tribunal Supremo como tribunal de mayor jerarquía en la Rama Judicial. K-Mart Corp. v. Walgreens of P.R., 121 D.P.R. 633, 637 (1988). Cónsono con lo anterior, dicho foro ha resuelto que la legislación sobre la materia que puedan aprobar las otras ramas de gobierno es una de carácter estrictamente directivo y no mandatorio. Colegio de Abogados de P.R. v. Schneider I, 112 D.P.R., a la pág. 546; In re Bosch, 65 D.P.R. 248, 251 (1945).

En este caso, el recurrido sostiene que las Leyes violan la separación de poderes porque usurpan el poder inherente del Tribunal Supremo para reglamentar la

profesión de la abogacía y se emiten órdenes e imponen deberes a éste. No le asiste la razón.

Mediante la Ley 121 se cambió la colegiación compulsoria de los abogados y abogadas en nuestra jurisdicción establecida en la Ley 43 a una voluntaria, al disponerse que para ejercer esta profesión no era necesario que el abogado o abogada estuviera afiliado al Colegio. Conforme lo anterior, se estableció que aquellos abogados y abogadas que no se colegiaran tendrían que pagar una anualidad al Tribunal Supremo, se fijó dicha anualidad, cómo ésta podría variarse y los usos que se darían a la misma y se aprobaron varias disposiciones relacionadas con el referido cambio de la naturaleza de la colegiación, de manera que ocurriera una transición ordenada por esta innovación. Según su Exposición de Motivos, la Asamblea Legislativa consideró que era "imperante que todos los miembros de la profesión legal en Puerto Rico… gocen de la misma representatividad en la entidad gremial que los agrupa… [y] que el Colegio de Abogados de Puerto Rico fomente la participación efectiva de todos sus miembros". En consecuencia, razonó que "no se justifica[ba] la afiliación compulsoria para que [los abogados y abogadas] sigan siendo lo que son: hacedores y servidores fieles a una justicia inteligente y democrática". Expuso que la acción legislativa para eliminar el requisito de la colegiación obligatoria "sirve

a los mejores propósitos del desarrollo de la profesión jurídica de Puerto Rico".

Por su parte, la Ley 135, esencialmente, cambió el procedimiento de votación para elegir al Presidente y los delegados por acumulación y regionales de la Junta de Gobierno del Colegio y enmendó varias de las disposiciones de las Leyes 43 y 121. En la Exposición de Motivos de la Ley 135 se reconoció que, por la naturaleza estatutaria del Colegio, resultaba necesario que éste fuera un foro representativo de la diversidad de ideas y pensamientos entre los abogados y abogadas y se respetaran las diferencias de criterios y opiniones en distintos aspectos, incluyendo el ideológico y político. Asimismo, se destacó las necesidades de reevaluar los mecanismos vigentes que databan de 1932 para la selección del Presidente y los delegados por regiones y acumulación de la Junta de Gobierno y garantizar la participación de todos los abogados y abogadas que voluntariamente pertenecieran al Colegio en la toma de decisiones. Al concluir que el voto directo de los colegiados era arcaico, obsoleto y antidemocrático, propuso un sistema de voto secreto mediante correo electrónico o correo regular.

De un examen de las Leyes surge que las mismas no contienen disposición alguna que incida sobre el poder inherente del Tribunal Supremo para regular el ejercicio de la profesión legal en Puerto Rico. Esta legislación no

incluye preceptos sobre la función del Tribunal Supremo de admitir y remover abogados y abogadas de la práctica de la profesión legal, las normas éticas que aplican a éstos y éstas o las reglas relacionadas con el ejercicio de la profesión de abogado en Puerto Rico. Tampoco vemos cómo las disposiciones específicas que el recurrido cuestiona, incluyendo las relacionadas con la forma mediante la cual el Tribunal Supremo fijará, modificará y utilizará la cuota que pagarán los abogados no afiliados al Colegio y el número que utilizarán los abogados para identificarse en sus escritos en los tribunales, afecta la facultad de nuestro más alto Tribunal para reglamentar la profesión legal. Se trata de preceptos relacionados y necesarios para implantar el cambio de la colegiación de compulsoria a voluntaria. No consideramos que es una situación en la que una Rama de Gobierno asume una función conferida a otra. Compárese, Pueblo v. Santiago Feliciano, 139 D.P.R. 361 (1995).

Por lo tanto, somos de la opinión que las Leyes no infringen el principio de la separación de poderes. De todos modos, si, como aduce el recurrido, esta legislación afectara el poder inherente del Tribunal Supremo para regular a los abogados y abogadas, la legislación sería una de carácter estrictamente directivo y no mandatario, lo que no conlleva necesariamente que sea inválida. Véase,

Colegio de Abogados de P.R. v. Schneider I, _supra_; _In re_ Bosch, _supra_.

De otra parte, el recurrido sostiene que las Leyes pretenden revocar lo resuelto en Schneider I y Schneider II. Tampoco le asiste la razón.

En primer lugar, lo que se resolvió en Colegio de Abogados v. Schneider I, _supra_, fue que la colegiación compulsoria establecida mediante la Ley 43, al igual que la obligación de pagar la cuota de colegiación correspondiente, era válida. _Id._, a las págs. 546-547 y 550. No vemos cómo este dictamen se revoca por la promulgación de las Leyes. En éstas sólo se cambia la naturaleza de la colegiación de compulsoria a voluntaria y, en forma alguna, se modifica o altera lo que el Tribunal Supremo resolvió en dicho caso. No se trata de una situación en la que una ley revisa una decisión judicial o cuando la parte que pierde un litigio obtiene legislación que le permite continuar con una acción declarada ilegal por un tribunal, de manera que se interfiere impermisiblemente con el ejercicio del Poder Judicial. Compárese, Colón Cortés v. Pesquera, _supra_; Misión Ind. P.R. v. J.P., _supra_.

Contrario a lo aducido por el recurrido, consideramos que Schneider I apoya nuestra conclusión de que las Leyes no infringen la separación de poderes. En ese caso dos abogados alegaron que la Legislatura carecía de facultad

para establecer requisitos para el ejercicio de la abogacía porque éste le pertenecía exclusivamente al Tribunal Supremo. <u>Colegio de Abogados</u> v. <u>Schneider I</u>, 112 D.P.R., a la pág. 543. El Tribunal Supremo resolvió que carecía de méritos dicha alegación al determinar que:

> "Es inmeritorio el argumento de los querellados de que la Asamblea Legislativa de Puerto Rico carece de poder para ordenar, como hizo en 1932, la integración de nuestro foro. Es cierto, según hemos señalado repetidas veces, que la admisión al ejercicio de la abogacía es función inherente de este Tribunal y que la legislación aprobada sobre esta materia, tal como la Ley Núm. 43, "es puramente directiva, no mandatoria para esta Corte". La preeminencia de la acción judicial en este campo, el cual incluye naturalmente la facultad de pasar juicio sobre si debe unificarse o no el foro en una jurisdicción y bajo qué condiciones, no significa que la legislación sobre estos particulares que no conflija con las pautas que este Tribunal establezca sea nula. <u>Id.</u>, a la pág. 546. (Citas omitidas).

Así, se concluyó era inmeritorio aducir que el legislador carecía de poder para ordenar la profesión legal. Por ende, aunque el **Tribunal Supremo posee el poder inherente para reglamentar la profesión legal**, ha reconocido la facultad de la Asamblea Legislativa para promulgar estatutos que respondan a la necesidad de atemperar el ejercicio de la profesión legal y, en consecuencia, no viola la separación de poderes legislación que cambie la colegiación de los abogados y

abogadas de obligatoria a voluntaria. Por lo tanto, se debieron desestimar las reclamaciones segunda y tercera del recurrido.

C.

En la Cuarta Reclamación de la Petición Enmendada el recurrido alega que la Ley 135 es nula porque infringe varios de los requisitos establecidos en la Sección 17 del Artículo III de nuestra Constitución, L.P.R.A., Tomo 1, págs. 396-397, sobre la redacción y el trámite de las leyes aprobadas por la Asamblea Legislativa. Específicamente sostiene que: (1) el título de la Ley 135 es defectuoso porque no expresa claramente el asunto que se añadió al proyecto de ley original para corregir errores de la Ley 121; (2) la Ley 135 contiene dos asuntos, los cuales no pueden tramitarse en sólo un proyecto de ley, porque enmienda la Ley 43 para cambiar el sistema de votación para elegir al Presidente y la Junta de Gobierno del Colegio y, a su vez, enmienda la Ley 121 para intentar corregir ciertos errores; (3) se enmendó el proyecto original para variar su propósito inicial de cambiar los procesos de votación del Colegio e incorporar materias extrañas al mismo al incluir enmiendas con el fin de corregir omisiones y errores de la Ley 121; y (4) la enmienda al Artículo 2 de la Ley 43 tiene el defecto de que se utilizaron puntos suspensivos en todos sus incisos, lo que impide conocer el texto vigente.

La citada Sección 17 del Artículo III de nuestra Constitución establece, en lo pertinente, lo siguiente:

"No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente. expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula…. Ningún proyecto de ley será enmendado de manera que cambie su propósito original o incorpore materias extrañas al mismo. Al enmendar cualquier artículo o sección de una ley, dicho artículo o sección será promulgado en su totalidad tal como haya quedado enmendado."

Las disposiciones. sobre el título y asunto de una ley incluidas en este precepto se aprobaron para impedir prácticas fraudulentas, facilitar la labor legislativa y vedar que grupos minoritarios incorporaran sus propuestas favoritas en una sola ley y se unieran para obtener una mayoría artificial que no existiría si cada propuesta se considerara por separado. A su vez, las disposiciones sobre enmiendas se promulgaron para complementar en parte los preceptos sobre el título y asunto y, además, para impedir que el legislador aprobara las enmiendas sin tener una noción clara de su alcance y significado. 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, págs. 2584-2585 (Ed. Conmemorativa 2003).

Así, el Tribunal Supremo ha expresado que el propósito de las exigencias constitucionales sobre el título de un proyecto de ley "es informar al público en

general y a los legisladores en particular el asunto que es objeto de la ley, de forma que el primero pueda oponerse a su aprobación si la considera lesiva y los segundos estén en condiciones de emitir su voto conscientes del asunto objeto de legislación". Cervecería Corona, Inc. v. J.S.M., 98 D.P.R. 801, 812 (1970). No se requiere que el título de la ley tenga una descripción minuciosa de lo que se desea aprobar y es suficiente con que se exprese, en términos generales, el propósito del estatuto. Dorante v. Wrangler, 145 D.P.R. 408, 428 (1998).

Además, cuando la ley impugnada es una enmendatoria, la norma, según se indica en Cervecería Corona, Inc. v. J.S.M., 98 D.P.R., a la pág. 812, es la siguiente:

"Cuando se trata de una ley enmendatoria la doctrina prevaleciente no requiere que en el título se expongan los cambios específicos que se intentan en virtud de la enmienda propuesta, siempre que la materia no sea remota o extraña a la de la ley original. De forma que cuando la ley básica comprende razonablemente la materia cubierta por la enmienda propuesta basta una referencia a la sección o artículo que se intenta enmendar. Sólo cualquier materia o asunto de carácter sustantivo que no sea germano con la sección o artículo especificado transgredirá la norma constitucional."

Dicho de otra manera, "siempre que materia enmendatoria sea congruente con el asunto de la ley original, un título… cumple con el requisito constitucional. A contrario sensu, si la materia

enmendatoria constituye una clara desviación y un cambio completo del asunto de la ley original, en tales circunstancias un título como el indicado infringe el precepto constitucional". Laboy v. Corp. Azucarera Saurí & Subirá, 65 D.P.R. 422, 428 (1945).

Al interpretar esta disposición constitucional, reiteradamente el Tribunal Supremo ha establecido "que solamente en un caso *claro y terminante* se justifica anular una ley por adolecer su título de deficiencias". Dorante v. Wrangler, 145 D.P.R., a la pág. 427. Véase, además, Cervecería Corona, Inc. v. J.S.M., 98 D.P.R., a la pág. 811; Rivera v. Corte, 62 D.P.R. 513, 540 (1943).

Como primer fundamento el recurrido alega que el título de la Ley 135 es defectuoso porque no expresa claramente el asunto que se añadió al proyecto de ley original para corregir errores de la Ley 121. Sostiene que en dicho título sólo se señala que se cambió el proceso de elección de los oficiales del Colegio sin indicarse expresamente los otros cambios a varias leyes y, como se limita a enumerar disposiciones, ello no es suficiente aviso al legislador y el público. No tiene razón.

Primeramente, la Ley 135 es una enmendatoria de las Leyes 43, 121 y la núm. 115 de 6 de mayo de 1941, según enmendada. De un examen del título de la Ley 135 surge claramente que en el mismo se incluyen todos los artículos y secciones de las leyes que se enmiendan, renumeran,

añaden o derogan y que sus disposiciones van dirigidas al funcionamiento y reestructuración del Colegio. Así, la Ley 135 cumple con el referido precepto constitucional, pues, según indicado, la normativa establece que el título de una ley no tiene que contener una descripción minuciosa de lo que persigue y "es suficiente que en términos generales exprese su propósito; que sea un índice de su contenido... [Y,] cuando la ley básica comprende razonablemente la materia cubierta por la enmienda propuesta[,] basta una referencia a la sección o artículo que se intenta enmendar". Cervecería Corona, Inc. v. J.S.M., 98 D.P.R., a la pág. 811. Por lo tanto, el título de la Ley 135 no es defectuoso y el recurrido no ha justificado invalidar dicho estatuto por tal fundamento.

En segundo lugar, el Colegio aduce que la Ley 135 contiene dos asuntos, por lo que no pueden tramitarse en sólo un proyecto de ley. Indica que, por un lado se enmienda la Ley 43 para cambiar el sistema de votación para elegir al Presidente y la Junta de Gobierno del Colegio y, a su vez, se enmienda la Ley 121 para intentar corregir ciertos errores. Además, señala que los Artículos 9 y 18 de la Ley 135, que establecen que las entidades que reciban fondos de la cuota fijada por el Tribunal Supremo tienen que tener total independencia del Colegio y prohíben a las entidades públicas pagar cuotas de abogados

afiliados al Colegio, respectivamente, no son germanas al fin de la Ley 135. Tampoco tiene razón.

El criterio para evaluar este planteamiento es si las disposiciones de la Ley 135 son germanas. Sobre este concepto, conocido como *germaneness*, se ha indicado lo siguiente:

> "The general test used to determine whether the constitutional prohibition against plurality of subject matter has been violated is to decide whether the various provisions are germane to the subject presented in the title. 'Germane' is defined as: in close relationship, appropriate, relevant or pertinent to the general subject. No portion of a bill not germane to the general subject can be given the force of law. The constitution is complied with if the various provisions relate to, and carry out the general purpose of an enactment. 'When the subject is expressed in general terms, everything which is required to make a complete enactment in regard to it, or which results as a compliment of the thought contained in the general expression, is included in and authorized by it.' If there is any reasonable basis for grouping the various matters together and if the public will not be deceived, then the act will be sustained.
>
> The Oregon Supreme Court has said the court should examine the body of the act to determine whether the court can identify a unifying principle logically connecting all provisions in the act and if it is apparent in the act, then the court must look to the title to see if such a unifying principle is present. No accurate mechanical rule may be formulated by which the sufficiency of an act in relation to its title may be determined. Each case must be decided on its own peculiar

facts. Yet care should be taken that the statute should not be construed narrowly or technically to invalidate proper and needful legislation.

Rational unity or a natural connection existed between trusts and powers of appointment, which meant the inclusion of the latter in statutes dealing with trust agreements did not violate the provision that no bill shall embrace more than one subject. In Alaska to comply with the 'one-subject' rule all that is necessary is that matters treated in legislation fall under one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject. In that light the passage of a bill authorizing the sale of bonds for construction and improvement of certain correction facilities throughout the state and authorization for similar bonds for construction and improvement of certain public safety facilities did not violate the one-subject rule. In California which uses the broad reasonably germane test, the single subject requirement is met if the legislation exhibits a single scheme whereby its various provisions interrelate sufficiently to achieve a common underlying purpose."

1A N. Singer, Statutes and Statutory Construction, Sec. 17:3, págs. 18-27 (2002).

Conforme lo anterior, se cumple con el requisito de germaneness si existe un concepto o tema central que cubre las disposiciones de la Ley 135; esto es, los preceptos de dicho estatuto son germanos si tienen una relación cercana, apropiada, relevante o pertinente al asunto general de la Ley 135 expresado en su título. Consideramos

que las enmiendas incluidas en la Ley 135 constituyen asuntos germanos entre sí. Además, están relacionados con la ley sustantiva general que enmienda, la Ley 43.

Según indicado, por medio de la Ley 43 se creó y organizó el Colegio, lo que incluyó concederle ciertas facultades y deberes, y se estableció la colegiación compulsoria. Por su parte, mediante la Ley 121, entre otros asuntos, se redefinieron las referidas facultades y deberes del Colegio y se cambió la afiliación al mismo a una voluntaria. A su vez, la Ley 135 enmendó la Leyes 43 y 121 para, entre otras cosas, concederle al Tribunal Supremo discreción para cobrar una cuota a los abogados y abogadas, fijar la cuantía de ésta, disponer las entidades a las que podían otorgarse los fondos devengados de dicha cuota y que las entidades públicas podían pagar la referida cuota al Tribunal Supremo, establecer una nueva forma de votación para elegir al Presidente del Colegio y su Junta de Gobierno y aprobar los asuntos que se requiera sean refrendados por asamblea y establecer un proceso para cumplir con las medidas aprobadas.

Es claro que en la Ley 135 se incluyeron varios asuntos. Sin embargo, somos de la opinión que los mismos están relacionados entre sí y son consecuencia del cambio de la colegiación compulsoria a la afiliación voluntaria. Como señalamos, los asuntos se refieren, esencialmente, a cómo se pagará y utilizará la cuota que fije el Tribunal

Supremo a los abogados y abogadas que no se afilien al Colegio y cómo éste se organizará y operará según fue reestructurado por la Ley 121. Por ende, las disposiciones de la Ley 135 son germanas entre sí y se relacionan de manera cercana y pertinente con la Ley 43, la que creó y organizó el Colegio y le otorgó sus deberes y funciones, y la Ley 121. En consecuencia, los asuntos incluidos en la Ley 135 se podían tramitar y aprobar en una sola medida legislativa.

En su tercer argumento, el recurrido indica que se enmendó el proyecto original para variar su propósito inicial de cambiar los procesos de votación del Colegio y, al incluir enmiendas con el fin de corregir omisiones y errores de la Ley 121, se le incorporaron materias extrañas al mismo. Indica que es contradictorio que luego de que se cambiara que la colegiación fuera voluntaria en vez de compulsoria, que se le despojara de la prerrogativa de los cuerpos rectores de cómo conducen sus votaciones. No le asiste la razón.

El citado precepto constitucional establece que un proyecto de ley no puede ser enmendado para cambiar su propósito original o incorporar materias extrañas al mismo. En este sentido, en <u>Rivera</u> v. <u>Corte</u>, 62 D.P.R., a la pág. 539, el Tribunal Supremo expresó que el fin de esta disposición era:

" '[I]mpedir la inclusión en la ley de materia incongruente y extraña, y a la vez poner en guardia contra la inadvertencia, la ocultación y el fraude en la legislación,' o … 'evitar la práctica, corriente en todas las legislaturas donde no existe tal disposición, de incluir en la ley materias incongruentes que no tienen relación alguna entre sí o con el sujeto especificado en el título, a virtud de lo cual se aprueban medidas sin atraer atención que, si hubieran sido vistas, hubieran sido impugnadas y derrotadas. Así parece evitar sorpresas en la legislación.'" (Citando a Posados v. Warner, B. & Co., 279 U.S. 340 (1929) y Louisiana v. Pilsbury, 105 U.S. 278 (1881).

De una lectura de la Ley 135 surge que, como hemos indicado, sus disposiciones no son extrañas entre sí y los asuntos contenidos en la misma, incluyendo las enmiendas que se aprobaron del proyecto de ley original, no son incongruentes con las Leyes 43 y 121. Por el contrario, esta legislación trata sobre el cambio de la colegiación de los abogados de compulsoria a voluntaria y cómo funcionará el Colegio al amparo de este nuevo mecanismo. Por ende, la Ley 135 no adolece de la referida deficiencia que aduce el recurrido.

Finalmente, el Colegio señala que la enmienda al Artículo 2 de la Ley 43 tiene el defecto de que se utilizaron puntos suspensivos en todos sus incisos, lo que impide conocer el texto vigente. Tampoco le asiste la razón.

En el citado precepto constitucional se establece que, al enmendar un artículo o una sección de un estatuto, dicho artículo o sección se promulgará en su totalidad tal como haya quedado enmendado. De una lectura del Artículo 1 de la Ley 135 claramente surge que mediante el mismo el legislador eliminó los incisos (f) y (g) del Artículo 2 de la Ley 43 y, considerando lo anterior, renumeró los restantes incisos para mantener la numeración secuencial de los mismos. Así, se cumplió con el requisito constitucional indicado.

En resumen, la **Ley 135 no infringe la Sección 17 del Artículo III de nuestra Constitución.** Ciertamente, no estamos ante "un caso *claro y terminante* [en el que] se justifica anular una ley por adolecer su título de deficiencias". Dorante v. Wrangler, 145 D.P.R., a la pág. 427. Véase, además, Cervecería Corona, Inc. v. J.S.M., 98 D.P.R., a la pág. 811; Rivera v. Corte, 62 D.P.R., a la pág. 540. Por lo tanto, no procede la cuarta reclamación del recurrido.

D.

En las Quinta y Sexta reclamaciones el recurrido alega que las Leyes violan el derecho a expresión y asociación del Colegio y sus miembros. Sostiene que, como ahora es una asociación de membresía voluntaria, el Colegio se convirtió en una entidad privada a la que el Estado no puede imponerle restricción alguna que le afecte

sus derechos a la libre expresión y asociación. Así, indica que la Legislatura no puede imponerle restricciones de cómo funcionar, tales como la forma en la que el Colegio fija y aprueba su cuota de colegiación, el efecto en la membresía por la falta de pago, el proceso para elegir al Presidente y sus delegados, cuándo se celebrarán las Asambleas y cómo éstas se notificarán a sus miembros y cómo se establecerán las delegaciones de distrito. Asimismo, aduce que no se le pueden imponer los deberes que se establecen en la Sección 7 de la Ley 121, incluyendo el de establecer comisiones cuando se lo soliciten el Gobernador y la Asamblea Legislativa porque así se utilizan los recursos del Colegio para fines públicos. Además, sostiene que no se le puede prohibir expresarse sobre idea política alguna, ni determinar quienes pueden ser sus miembros y que esta legislación restringe sustancialmente las actividades y facultades del Colegio en perjuicio de sus miembros. Finalmente, indica que se vulneran estos derechos de sus miembros porque, al imponerse la descolegiación, se privó a todos los abogados de su membresía en una organización que puede representarlos y a los abogados del servicio público se prohíbe que sus cuotas puedan ser pagadas como resultado de su afiliación al Colegio. No tiene razón.

La Sección 4 del Artículo II de nuestra Constitución, L.P.R.A., Tomo 1, pág. 285, al igual que la Primera

Enmienda de la Constitución Federal, L.P.R.A., Tomo 1, pág. 181, consagra el derecho de toda persona a la libre expresión. Este derecho fue concebido, entre otras razones, "para facilitar el desarrollo pleno del individuo y estimular el libre intercambio y la diversidad de ideas, elementos vitales del proceso democrático". Velázquez Pagán v. A.M.A., 131 D.P.R. 568, 576 (1992). Como corolario de este derecho, la Sección 6 del Artículo II de nuestra Constitución, L.P.R.A., Tomo 1, pág. 294, reconoce el derecho de las personas a asociarse y organizarse para cualquier fin lícito con igual libertad. "Ambos derechos son fundamentales para la consecución y ejercicio de la libertad de conciencia lo que… obliga [a los tribunales] a su más celosa protección." Rodríguez v. Srio. de Instrucción, 109 D.P.R. 251, 255 (1979).

No obstante, estos derechos no son absolutos y pueden ser subordinados a otros intereses cuando la necesidad y conveniencia pública así lo requieran. Véase, Mari Brás v. Casañas, 96 D.P.R. 15, 21 (1968). Por lo tanto, ambos derechos están sujetos a ciertas restricciones y su ejercicio debe realizarse de una manera moralmente responsable. Véase, Aponte Martínez v. Lugo, 100 D.P.R. 282, 290 (1971).

En el presente caso somos de la opinión que el contenido y la aplicación de las Leyes 121 y 135 no representan un esquema de expresión obligada que sea

contrario a las libertades de expresión y asociación. El recurrido parte de la premisa equivocada de que el Estado, en el ejercicio de su poder de reglamentación, no tiene facultad para promulgar estatutos que regulen la estructura y operación del Colegio porque asume que el legislador se está inmiscuyendo en el funcionamiento de una asociación privada.

No obstante, luego de que se aprobaran las Leyes 121 y 135 el Colegio continúa siendo como fue creado, una criatura legislativa, y por tanto, está sujeto a la regulación del Estado. Así, mediante el Artículo 1 de la Ley 43, 4 L.P.R.A. sec. 771, el Colegio fue instaurado como una entidad jurídica o corporación cuasi pública al disponerse que:

> "Por la presente se constituye a los profesionales con derecho a ejercer la abogacía ante el Tribunal Supremo de Puerto Rico, siempre que la mayoría de aquéllos así lo acuerden en referéndum que al efecto se celebrará según se dispone más adelante, en entidad jurídica o corporación cuasi pública bajo el nombre de Colegio de Abogados de Puerto Rico y con domicilio en la Capital."

En vista de que el Colegio es una entidad creada por la Asamblea Legislativa, ésta tiene el poder de enmendar, modificar, suplantar o derogar la ley que lo creó. Cf., Col. Ing. Agrim. P.R. v. A.A.A., 131 D.P.R. 735, 753-755 (1992); Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229, 236 (1988). Ciertamente, las Leyes 121 y 135

no derogan la Ley 43 ni enmiendan el Artículo 1 de ésta para convertir al Colegio en una entidad privada. En estas leyes esencialmente se determinó que para que un abogado pudiera ejercer su profesión no se requería su afiliación compulsoria al Colegio y, sin cambiar la naturaleza de éste ni suprimirlo, variaron el mecanismo operacional del Colegio.

El recurrido sostiene que conforme cierta jurisprudencia federal, una vez se constituyó mediante el referéndum ordenado en el citado Artículo 1 de la Ley 43, la Asamblea Legislativa no tenía facultad legal para enmendar la franquicia corporativa del Colegio sin el consentimiento de éste, ni enmendar sus facultades y deberes. Escrito Suplementario en Oposición a la Expedición de los Autos de *Certiorari* Solicitados, págs. 5-13. No le asiste la razón.

Primeramente, este argumento no fue presentado por el recurrido en el TPI, por lo que no puede aducirlo en alzada. Es norma establecida que este Tribunal no considerará señalamientos no planteados por las partes a nivel de instancia. Véase, Sánchez v. Eastern Air Lines, Inc., 114 D.P.R. 691, 696 (1983). Debido a que lo que alega el recurrido ante este Tribunal no fue lo que adujo en el TPI, no podemos atender su planteamiento.

De todos modos, hemos examinado esta alegación y no encontramos que tenga razón. En el caso de Trustees of

Dartmouth College v. Woodward, 17 U.S. 518 (1819), citado por el recurrido, el Tribunal Federal resolvió que una franquicia corporativa organizada con permiso de la Legislatura, apoyada en gran parte por contribuciones voluntarias y manejada por oficiales y directores que no son representantes del estado ni subdivisión política alguna, es una corporación privada, aunque realizara trabajo caritativo o deberes semejantes a las corporaciones públicas protegida por el Artículo 1, Sección 10, inciso 1 de la Constitución Federal, que establece que "[n]ingún estado aprobará ningún proyecto [de ley] que menoscabe la obligación de los contratos", L.P.R.A., Tomo 1, pág. 169.

Por otro lado, en el caso citado por el Colegio de Andy's Ice Cream, Inc. v. City of Salisbury, 724 A.2d 717, 732 (1999), el Tribunal de Apelaciones de Maryland señaló que:

> "Quasi-public corporations occupy the middle ground between public and private corporations, generally having the functions of the former and the structure of the latter. The Court of Appeals, in Potter v. Bethesda Fire Department, Inc., 309 Md. 347, 354, 524 A.2d 61 (1987), explained that a 'quasi-public corporation' is not per se public or governmental. On its face, the term connotes that it is not a public corporation but a private one. But 'quasi' indicates that the private corporation has 'some resemblance (as in function, effect or status)' to a public corporation. … 'Quasi' bespeaks 'that one subject resembles another …

in certain characteristics, but that there are intrinsic and material differences between them.' [Omitting citations to dictionaries].

[…] For instance, quasi-public corporations are usually wholly private companies acting for public benefit. "A quasi-public corporation is, by its very words, not a public corporation, and thus is a private corporation. But the word 'quasi' … denotes that it has the characteristic of a public corporation in function, effect or status." Potter, 309 Md. At 357 (citing 1 W. Fletcher & C. Swearingen, *Cyclopedia of the Law of Private Corporations* § 63 at 600 (1983. Rev. Vol.))."

Sin embargo, este no es el caso que aquí nos ocupa. Según indicado, el Colegio es una entidad cuasi pública creada mediante el citado Artículo 1 de la Ley 43 y las Leyes impugnadas no enmendaron dicho artículo para convertirlo en una entidad privada. Además, somos de la opinión, que las facultades que el legislador le concedió al Colegio lo ubican en una posición particular en el esquema social del país lo que lo diferencia de una corporación privada. Acorde con lo anterior, y dada la naturaleza cuasi pública del Colegio, entendemos que la Asamblea Legislativa está facultada para proponer cambios en la Ley que creó al Colegio. Por lo tanto, se equivoca el recurrido al señalar que el Colegio es una entidad privada, cuya franquicia no puede ser modificada por la Asamblea Legislativa sin el consentimiento del Colegio.

De otra parte, el recurrido aduce que es contrario a las libertades de expresión y asociación la obligación que se le impuso en el nuevo Artículo 13 (6) de la Ley 43, aprobado en la Sección 7 de la Ley 121, de responder a las peticiones del Gobernador y la Asamblea Legislativa de crear comisiones de investigación y consulta porque se utilizan recursos de una "asociación privada" para promover fines públicos y el Colegio tiene la libertad de escoger los asuntos en los cuales expresarse. Además, alega que no se le puede impedir expresarse sobre ideas políticas como se dispone en el nuevo Artículo 13 (7) de la Ley 43 porque ello viola la libertad de expresión. No tiene razón.

En primer lugar, según indicado, el legislador tiene la prerrogativa de fijar tal deber y establecer las limitaciones a las facultades del recurrido que entienda necesarias porque el Colegio es una criatura de la Asamblea Legislativa. Además, en esta legislación se reconoció que la misión de administrar la justicia recae principalmente en los miembros de la profesión legal, por lo que, al participar en los procesos públicos, los abogados cumplen su responsabilidad de que se mantenga un orden jurídico íntegro y eficaz. Preámbulo de los Cánones de Ética Profesional de Puerto Rico, 4 L.P.R.A. Ap. IX. Por lo tanto, mediante las Leyes válidamente se le podían imponer las obligaciones indicadas al Colegio.

**TS 87**

De todos modos, en el nuevo Artículo 13 (6) de la Ley 43 aprobado en la Ley 121 se dispuso que, al emitir sus evaluaciones e informes requeridos por cualquiera de las tres Ramas del Gobierno, el Colegio "tendrá total y absoluta independencia para recomendar y asumir aquella postura que mejor entienda responde a sus propósitos y deberes así como a los mejores intereses del Pueblo de Puerto Rico". Así, aún cuando le cobijaran los derechos que aduce el Colegio, la propia ley le concede independencia absoluta para asumir la posición que entienda procedente y de forma alguna se afectan tales derechos. Además, según el nuevo Artículo 13 de la Ley 43, el Colegio tiene facultad para "[e]stablecer y crear comisiones permanentes y temporeras de investigación y consulta en aquellas ocasiones que su Junta de Gobierno así lo apruebe con el fin de promover sus objetivos y obligaciones". Finalmente, resaltamos que, en el anterior Artículo 13 (2) de la Ley 43, se imponía al Colegio la obligación de "evacuar los informes y consultas que el Gobierno le reclame", deber que es similar al aquí impugnado por el recurrido y que, a nuestro mejor entender, no fue cuestionado anteriormente por el Colegio.

Los otros señalamientos del recurrido se refieren a la "descolegiación", los requisitos y procedimientos que tienen que seguir los abogados y abogadas que elijan colegiarse y el pago de la cuota. Un examen de las Leyes

claramente demuestra que las mismas no coartan el derecho a asociarse. Por el contrario, **los cambios establecidos en esta legislación abonan al derecho a la libertad de asociación porque provee a los abogados y abogadas la libertad de ser miembros de la entidad que prefieran.** Además, no se impuso una cuota anual específica al permitir que "aquellos abogados y abogadas que opten por afiliarse al Colegio de Abogados pagarán la cuota establecida por dicha asociación". Sección 10 de la Ley 121, según enmendada por el Artículo 6 de la Ley 135. De igual modo, la regulación sobre el proceso en que se llevará a cabo la colegiación voluntaria y el cobro de la cuota son disposiciones razonables sobre los procesos necesarios para que el Colegio pueda manejar el cambio de la colegiación compulsoria a voluntaria y los abogados y abogadas puedan conocer el procedimiento con el que deben cumplir. Asimismo, el término fijado para cobrarla sirve de aliciente e imparte certeza para los abogados que deseen colegiarse. Por lo tanto, procedía desestimar las Reclamaciones Quinta y Sexta del Colegio.

E.

En la Séptima Reclamación, el recurrido plantea que la Leyes son inconstitucionales porque violan el derecho a la igual protección de las leyes. Argumenta que el Estado no puede cumplir con su obligación de probar que existe un interés público apremiante que justifique la clasificación

y que la misma es necesaria para promover ese interés, por lo que no se cumple el criterio estricto o riguroso, y tampoco existe un nexo racional entre las medidas legislativas y un fin legítimo del Estado al aprobar las mismas. No tiene razón.

El Artículo II, Sección 7 de nuestra Constitución, L.P.R.A., Tomo 1, pág. 296, prohíbe que se le niegue a una persona la igual protección de las leyes. Esta garantía se activa al evaluar una legislación que crea clasificaciones entre grupos, discriminando con respecto a unos frente a otros. Dicha cláusula, sin embargo, no impide que el Estado establezca clasificaciones para descargar adecuada y eficientemente sus funciones, ni exige un trato igual a todos los ciudadanos; sólo prohíbe un trato desigual e injustificado. Por ello, el Estado puede establecer clasificaciones siempre que las mismas sean razonables y estén dirigidas a alcanzar o proteger un interés público legítimo. Asoc. Academias y Col. Cristianos v. E.L.A., 135 D.P.R. 150, 167 (1994).

Para decidir si una clasificación cumple con esta garantía constitucional la clasificación se evalúa, dependiendo de la naturaleza de los derechos afectados, bajo el escrutinio estricto o el mínimo. Zachry International v. Tribunal Superior, 104 D.P.R. 267, 277 (1975). El estricto aplica a las clasificaciones sospechosas -las basadas en raza, color, sexo, nacimiento,

origen o condición social, ideas políticas o religiosas y nacionalidad- o cuando la clasificación afecta el ejercicio de un derecho de arraigo constitucional. Asoc. Academias y Col. Cristianos v. E.L.A., 135 D.P.R., a la pág. 168. Si este criterio aplica, la ley se presume inconstitucional y corresponde al Estado probar que la clasificación responde a un interés estatal apremiante y es necesaria para promover ese interés, esto es, no existe un medio menos oneroso para alcanzar el mismo. San Miguel Lorenzana v. E.L.A., 134 D.P.R. 404, 425 (1993).

Por su parte, el escrutinio mínimo se utiliza cuando el estatuto es de naturaleza socioeconómica. Bajo este escrutinio se presume la constitucionalidad de la clasificación y corresponde a quien la impugna demostrar que la ley es claramente arbitraria y no existe nexo racional alguna entre ésta y un interés legítimo del Estado. M. & B. S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319, 333 (1987).

En el presente caso la legislación impugnada es una de tipo socioeconómico, por lo que se evalúa bajo el escrutinio mínimo o de nexo racional entre el propósito legislativo y la clasificación impugnada. El recurrido sostiene que las Leyes son inválidas porque varias de sus disposiciones, como los requisitos sobre la cuota anual y los deberes que se le imponen, tratan al Colegio de forma distinta a las demás asociaciones de profesionales en

Puerto Rico. No obstante, el recurrido no especifica como tal legislación establece un trato desigual e injustificado frente a otras personas en igual situación. Tampoco ha demostrado que la clasificación sea arbitraria, ni la ausencia de nexo racional entre la clasificación y el interés legítimo que se quiere proteger, por lo que tenemos que concluir que esta legislación no viola la igual protección de las leyes. San Miguel Lorenzana v. E.L.A., 134 D.P.R., a la pág. 426; M. & B. S., Inc. v. Depto. de Agricultura, 118 D.P.R., a la pág. 333.

De todos modos, el interés que se persigue con las Leyes es, según indicado, garantizar a los miembros de la profesión legal en Puerto Rico la igualdad de condiciones y representatividad en la entidad que los agrupa, que ésta represente la diversidad de ideas y pensamientos de los abogados y asegurar la participación de éstos en la toma de decisiones del Colegio, lo que constituye un interés legítimo del Estado. Por lo tanto, **las Leyes no violan la igual protección de las leyes porque existe racionalidad entre éstas y el propósito legislativo y no establece un trato desigual o discriminatorio a los miembros del Colegio.**

F.

Finalmente, ( .a Octava Reclamación el recurrido alega que las .eyes son inconstitucionales porque menoscaban la rela .. contractual entre el Colegio y sus

miembros. Sostiene que mediante esta legislación se modificaron varias disposiciones del Reglamento del Colegio, el cual constituye el contrato entre éste y sus miembros, sin existir un interés legítimo que justificara ese menoscabo. Así, señala que: la Sección 7 de la Ley 121 trastoca cómo se crean las comisiones temporales del Colegio y le impone el deber de crear comisiones cuando lo requiera una de las Ramas de Gobierno, no cuando su Presidente o Junta de Gobierno lo estimen necesario; los Artículos 3 y 4 de la Ley 135 modifican el proceso para seleccionar los puestos electivos del Colegio y aprobar resoluciones y le imponen el voto electrónico; el Artículo 19 de la Ley 135 usurpa la facultad de su Asamblea General para enmendar el reglamento del Colegio porque ordena que la Junta de Gobierno apruebe los reglamentos necesarios para la implantación de la Ley; y la Sección 4 de la Ley 121 impone una moratoria de 5 años para aumentar la cuota de colegiación y establece el procedimiento aplicable. No tiene razón.

La Sección 7 del Artículo II de nuestra Constitución, L.P.R.A., Tomo 1, pág. 296, establece, en lo pertinente, que:

> No se aprobarán leyes que menoscaben las obligaciones contractuales.

Esta disposición no constituye una prohibición absoluta que impide el poder de reglamentación del Estado

para beneficio del interés público. <u>Bayrón Toro</u> v. <u>Serra</u>, 119 D.P.R. 605, 619 (1987); <u>Warner Lambert Co.</u> v. <u>Tribunal Superior</u>, 101 D.P.R. 378, 394 (1973). No todo menoscabo de una obligación contractual es contrario a la prohibición constitucional. <u>Bayrón Toro</u> v. <u>Serra</u>, 119 D.P.R., a la pág. 619.

Esta garantía tiene su fundamento racional en que debe haber certeza en las consecuencias legales de lo contratado. Así, una ley no debe modificar esas consecuencias en perjuicio de uno de los contratantes porque las partes así lo confían. <u>Warner Lambert Co.</u> v. <u>Tribunal Superior</u>, 101 D.P.R., a la pág. 395.

Al considerar la validez de una ley conforme este precepto constitucional aplica el criterio de razonabilidad. En ese sentido, el tribunal tiene que establecer un balance razonable entre el interés social de promover el bien común y el de proteger las transacciones contractuales contra la aplicación arbitraria e irrazonable de los estatutos. <u>Bayrón Toro</u> v. <u>Serra</u>, 119 D.P.R., a la pág. 620.

La razonabilidad de la ley se determina considerando principalmente la sustancialidad del interés público promovido por el estatuto y la magnitud del menoscabo causado por su aplicación retroactiva. <u>Warner Lambert Co.</u> v. <u>Tribunal Superior</u>, 101 D.P.R., a la pág. 396. Si el menoscabo ocurre como consecuencia de una modificación



**TS 94**

razonable y necesaria para adelantar un interés público, el tribunal sostendrá su validez. Bayrón Toro v. Serra, 119 D.P.R., a la pág. 621.

En este caso, según indicado, el Colegio es una criatura legislativa, no una asociación privada. Por lo tanto, no puede sostenerse que existe un contrato entre partes privadas al cual aplique el citado precepto constitucional.

De todas maneras, aún cuando se considerara que la relación entre el Colegio y sus miembros es un contrato entre partes privadas, éste se entiende como renovado anualmente mediante el pago de la cuota. Así, **los abogados y abogadas que deseen formar parte de dicha entidad pueden voluntariamente acogerse siguiendo el procedimiento preceptuado mediante legislación.**

Además, en las Exposiciones de Motivos de las Leyes impugnadas se establecen amplios fundamentos que justifican la razonabilidad de tales medidas legislativas. En ese sentido, el Colegio fue concebido como parte de un esquema legislativo para que un abogado o una abogada pudiera ejercer su profesión y el origen legislativo para la práctica de la abogacía fue reevaluado, atemperándolo a una realidad historica que demostraba que no existía justificación para requerir una colegiación compulsoria. Por lo tanto, se  .  desestimar esta reclamación.

En resumen, consideradas las reclamaciones planteadas por el Colegio, concluimos que no existía impedimento para desestimarlas según fue solicitado al TPI y éste incidió al así no proceder. Por lo tanto, procede revocar el dictamen recurrido.

IV.

Por los fundamentos expresados, se expide el auto de *certiorari*, se revoca el dictamen recurrido y se desestima la petición enmendada del recurrido.

Adelántese inmediatamente por correo electrónico o telefax o teléfono y notifíquese posteriormente por la vía ordinaria.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.

Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Colegio de Abogados de          *
Puerto Rico por sí,             *
representado por su Presidente, *
Arturo Luis Hernández González, *
y en representación de sus      *
miembros                        *
                                *
        Peticionarios           *
                                *
            v.                  *        CC-2010-606
                                *
                                *
Estado Libre Asociado de        *
Puerto Rico; Hon. Luis Fortuño  *
Burset; Oficina de              *        Certiorari
Administración de los Tribunales *
y Hon. Sonia Ivette Vélez Colón *
                                *
        Recurridos              *
                                *
John E. Mudd                    *
                                *
        Interventor-Recurrente  *
                                *
*********************************

Voto Disidente emitido por el Juez Presidente SEÑOR HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 17 de marzo de 2011.

El día de hoy, este Tribunal adjudica sumariamente una controversia de altísimo interés público. Contrario a lo resuelto por una mayoría de este Tribunal, expediríamos el recurso de autos por entender que la naturaleza e importancia de las controversias constitucionales ante nos ameritan el pronunciamiento de este Tribunal.

Como se sabe, la colegiación compulsoria ha sido un tema de constante discusión pública en nuestro País. A

pesar de que habíamos expresado que ésta encuentra su justificación legal y su legitimidad tanto en el poder de razón de Estado como en el poder inherente de este Tribunal para regular la profesión legal y administrar la justicia, la Asamblea Legislativa aprobó la Ley Núm. 121 de 13 de octubre de 2009 y la Ley Núm. 135 de 6 de noviembre de 2009, que, en esencia, eliminan la colegiación compulsoria y le imponen una serie de requisitos al Colegio de Abogados para su operación interna.

Para disponer del recurso, una mayoría de este Tribunal ha optado por emitir una Resolución mediante la cual sostiene que la acción de la Asamblea Legislativa es un ejercicio válido de sus facultades constitucionales y, además, ordena la publicación de la sentencia del Tribunal de Apelaciones. Esto último, porque, de acuerdo con los compañeros jueces, "esa sentencia expone de manera correcta el derecho aplicable".

No obstante, al desatender el recurso de autos, este Tribunal deja en el aire múltiples cuestionamientos que merecen nuestra cuidadosa atención. Sin que de ningún modo el siguiente listado sea exhaustivo, algunas de estas interrogantes no resueltas son:

(1) ¿Constituye la referida acción legislativa una intromisión indebida que viola la separación de poderes frente a nuestro poder inherente de regular la profesión jurídica y la jurisdicción permanente que decidimos asumir

tras el caso de Colegio de Abogados v. Schneider II, 117 D.P.R. 504 (1986)?;

(2) ¿se viola el derecho a la igual protección de las leyes al brindarle al Colegio de Abogados un trato distinto al que reciben otras organizaciones profesionales?;

(3) ¿constituyen las referidas leyes una reglamentación inoficiosa del derecho a la libertad de expresión del Colegio como organización por virtud del contenido de sus expresiones públicas pasadas, a la luz del voluminoso historial legislativo?;

(4) siendo el Colegio -por vía legislativa- una organización de membresía voluntaria, ¿puede la Asamblea Legislativa proscribir determinado contenido de su Reglamento u operación administrativa?

A nuestro entender, las controversias planteadas en este caso requieren unos pronunciamientos de este Tribunal sobre la separación de poderes, particularmente en lo que respecta a las facultades para reglamentar el ejercicio de la abogacía y derechos constitucionales de la más alta jerarquía, como la libertad de expresión y asociación, que reclaman los peticionarios.

Al adjudicar estas controversias, no se debe pasar por alto el hecho de que el Tribunal Supremo de los Estados Unidos ha expresado en varias ocasiones que no existe razón constitucional para impedir que se le obligue a un profesional a pertenecer a una asociación cuyos fines éste no apruebe. Lathrop v. Donoheu, 367 U.S. 820 (1961); Abood

v. Detroit Board of Education, 431 U.S. 209 (1977). Con

ello en mente, hemos expresado que:

> [l]as singulares circunstancias sociopolíticas puertorriqueñas… apoyan aun con mayor fuerza la constitucionalidad de la [colegiación compulsoria]. Los intereses públicos en la creación de una sociedad vigorosamente pluralista, en el mejoramiento de la abogacía y en la buena marcha del sistema judicial pesan decididamente más que las inconveniencias personales que pueda acarrear en ciertos casos la colegiación obligatoria. El derecho a la no asociación, derivable del derecho contrario consagrado en la constitución… cede ante los intereses señalados. Colegio de Abogados de P.R. v. Schneider I, 112 D.P.R. 540, 549 (1982).

No cabe duda, pues, de que existen profundos y medulares cuestionamientos sobre la validez de la acción legislativa que no fueron atendidos debidamente por el Tribunal de Apelaciones. En consecuencia, no podemos dejar de preguntarnos: ¿han cambiado las condiciones sociopolíticas de Puerto Rico al punto de no requerir la colegiación de los abogados? ¿Hemos sido persuadidos de ello en el ejercicio de nuestro poder inherente? ¿Será este el principio de la descolegiación de profesiones tales como la medicina, la contabilidad pública o la ingeniería?

A nuestro entender, el denegar este recurso bajo el fundamento de que el Tribunal de Apelaciones resolvió "de manera correcta el derecho aplicable" constituye una indebida delegación de nuestra obligación de ser máximos intérpretes de nuestra Constitución. Este caso contiene precisamente el tipo de controversia que nos corresponde atender como foro de última instancia.

De otra parte, discrepamos de las expresiones sobre los méritos de la controversia que se consignan en la Resolución. La exposición detallada que se hace sobre el escrutinio aplicable a una acción legislativa de requerir la colegiación obligatoria de un grupo profesional causa profunda incertidumbre sobre ciertas disposiciones legislativas vigentes que afectan otras profesiones y el alcance de nuestra Constitución en cuanto al derecho a asociarse libremente. Véase, a modo de ejemplo, las siguientes disposiciones que actualmente exigen la colegiación de varias profesiones en nuestro País: Art. 12 de la Ley Núm. 211 de 12 de agosto de 2004, 20 L.P.R.A. sec. 3313 (**Colegio de Actores**); Art. 10 de la Ley Núm. 2 de 23 de febrero de 1990, 20 L.P.R.A. sec. 2377 (**Colegio de Administradores de Servicios de Salud**); Art. 21 de la Ley Núm. 265 de 13 de diciembre de 2006, 20 L.P.R.A. sec. 653 (**Colegio de Agrónomos**); Sec. 3 de la Ley Núm. 96 de 6 de julio de 1978, 20 L.P.R.A. sec. 753 (**Colegio de Arquitectos**); Art. 4 de la Ley Núm. 102 de 27 de junio de 1969, 20 L.P.R.A. sec. 1064 (**Colegio de Choferes**); Art. 3 de la Ley Núm. 75 de 31 de mayo de 1973, 20 L.P.R.A. sec. 795 (**Colegio de Contadores Públicos Autorizados**); Art. 4 de la Ley Núm. 54 de 21 de mayo de 1976, 20 L.P.R.A. sec. 2604 (**Colegio de Delineantes**); Art. 4 de la Ley Núm. 244 de 14 de agosto de 1998, 20 L.P.R.A. sec. 2247 (**Colegio de Diseñadores y Decoradores de Interiores**); Art. 3 de la Ley Núm. 122 de 12 de junio de 1980, 20 L.P.R.A. sec. 2013

(**Colegio de Peritos Electricistas**); Art. 6 de la Ley Núm. 9 de 20 de marzo de 1972, 20 L.P.R.A. sec. 2116 (**Colegio de Especialistas de Belleza**); Art. 3 de la Ley Núm. 12 de 29 de septiembre de 1980, 20 L.P.R.A. sec. 733 (**Colegio de Ingenieros y Agrimensores**); Sec. 1 de la Ley Núm. 130 de 18 de junio de 1973, 20 L.P.R.A. sec. 960 (**Colegio de Maestros y Oficiales Plomeros**); Sec. 5 de la Ley Núm. 107 de 10 de julio de 1986, 20 L.P.R.A. sec. 2971a (**Colegio de Médicos Veterinarios**); Sec. 13 de la Ley Núm. 124 de 23 de julio de 1974, 20 L.P.R.A. sec. 2192 (**Colegio de Nutricionistas y Dietistas**); Art. 4 de la Ley Núm. 129 de 17 de diciembre de 1993, 20 L.P.R.A. sec. 545c (**Colegio de Optómetras**); Art. 3 de la Ley Núm. 153 de 9 de mayo de 1941, 20 L.P.R.A. sec. 493 (**Colegio de Químicos**); Art. 20 de la Ley Núm. 36 de 20 de mayo de 1970, 20 L.P.R.A. sec. 2070 (**Colegio de Técnicos de Refrigeración y Aire Acondicionado**); Sec. 5 de la Ley Núm. 56 de 13 de julio de 2001, 20 L.P.R.A. sec. 73g (**Colegio de Médicos Cirujanos**); Art. 5 de la Ley Núm. 64 de 3 de julio de 1986, 20 L.P.R.A. sec. 2105b (**Colegio de Técnicos Dentales**); Art. 4 de la Ley Núm. 50 de 30 de junio de 1986, 20 L.P.R.A. sec. 2145c (**Colegio de Técnicos y Mecánicos Automotrices**); Art. 6 de la Ley Núm. 44 de 30 de mayo de 1972, 20 L.P.R.A. sec. 2156 (**Colegio de Tecnólogos Médicos**); Art. 3 de la Ley Núm. 171 de 11 de mayo de 1940, 20 L.P.R.A. sec. 823 (**Colegio de Trabajadores Sociales**); Sec. 5 de la Ley Núm. 306 de 15 de septiembre de 2004, 20 L.P.R.A. sec. 211d (**Colegio de Profesionales de la**

**Enfermería**); Art. 5 de la Ley Núm. 26 de 20 de julio de

2005, 20 L.P.R.A. sec. 235d (**Colegio de Enfermería Práctica**

**Licenciada**).   En   suma,   adelantar   criterios   sobre

controversias que el Tribunal optó por no atender ahora, es

análogo a emitir una opinión consultiva. Ello va en contra

de   precedentes   firmemente   arraigados   de   este   Tribunal.

Peor aún, como demuestra el listado que antecede, el nuevo

escrutinio   adelantado   hoy   mediante   la   Resolución   del

Tribunal   pone   en   peligro   de   extinción   la   mitad   de   la

legislación incluida en el Tomo 20 de la colección "Leyes

de Puerto Rico Anotadas".[1]

---

[1]No podemos pasar por alto que las fuentes de derecho citadas  por  los  compañeros  jueces  en  la  Resolución  del Tribunal,  para  sostener  que  una  limitación  a  la  libertad  a no  asociarse  es  constitucional  solamente  si  el  Estado demuestra  un  interés  apremiante,  son  muy  distinguibles  al caso  de  autos.  En  NAACP  v.  Button,  371  U.S.  415  (1963),  el Tribunal  Supremo  de  los  Estados  Unidos  invalidó  un  estatuto de  Virginia  que  le  impedía  a  los  demandantes  acercarse  a posibles  litigantes  para  ofrecerles  representación  legal  en casos  de  desegregación.   En  casos  donde  el  Tribunal  Supremo de  los  Estados  Unidos  se  ha  enfrentado  específicamente  a  la colegiación   compulsoria   de   abogados,   ha   aplicado   un escrutinio racional:

> Both in purport and in practice the bulk of
> State Bar activities serve the function, or at
> least so Wisconsin might **reasonably believe**,
> of  elevating  the  educational  and  ethical
> standards of the Bar to the end of improving
> the quality of the legal service available to
> the people of the State, without any reference
> to the political process. It cannot be denied
> that this is a **legitimate** end of state policy.
> Lathrop v. Donohue, 367 U.S. 820, 843 (1961).
> (Énfasis suplido).

Asimismo,  la  nota  de  Revista  Jurídica  del  estudiante de  U.C.  Davis  que  citan  los  compañeros  jueces  analiza  el caso  de  Clingman  v.  Beaver,  544  U.S.  581  (2005).  En  ese caso,  el  Tribunal  Supremo  de  los  Estados  Unidos  validó  un estatuto  de  Oklahoma  que  le  impedía  a  personas  registradas

Por todo lo anterior, expediríamos el auto y pautaríamos la normativa aplicable sobre las diferentes y complejas controversias constitucionales presentadas en este recurso. Además, ante el hecho de que este caso se encontraba en una etapa inicial de descubrimiento de prueba cuando fue acogido por el foro apelativo intermedio, celebraríamos una vista oral para brindarle una oportunidad a las partes de que expongan sus diversas posiciones.

Hace un cuarto de siglo manifestamos la importancia del Colegio de Abogados de Puerto Rico para nuestra profesión cuando nos unimos a la Opinión del Tribunal en Colegio de Abogados v. Schneider II, *supra*, emitida por voz del entonces Juez Presidente señor Pons Nuñez:

> El Colegio de Abogados ha cumplido adecuadamente las obligaciones que le impuso la ley que lo creó. Ha contribuido al mejoramiento de la administración de la justicia; ha formulado informes; ha contestado consultas reclamadas por el Gobierno; ha defendido con celo los derechos e inmunidades de los abogados procurando que éstos gocen ante los tribunales de la libertad necesaria para el buen desempeño de su profesión; ha promovido relaciones fraternales entre sus miembros, y ha velado por el sostenimiento de una saludable moral profesional entre los colegiados. También ha contribuido a enriquecer la vida intelectual de los abogados y ha fortalecido la aspiración colectiva a una sociedad democrática al amparo de la ley. *Íd*. págs. 513-14.

Una vez más, me reafirmo en esas expresiones. Por la importancia de esta institución en nuestra sociedad, el

_____

en un partido político votar por candidatos de una primaria de otro partido.

Colegio de Abogados de Puerto Rico merecía su día en corte y, con la decisión de hoy, se lo hemos denegado.


                                    Federico Hernández Denton
                                         Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Colegio de Abogados de Puerto Rico por sí, representado por su Presidente, Arturo Luis Hernández González, y en representación de sus miembros<br><br>Peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico; Hon. Luis Fortuño Burset; Oficina de Administración de los Tribunales y Hon. Sonia Ivette Vélez Colón<br><br>Recurridos<br><br>John E. Mudd<br><br>Interventor-Recurrente | CC-2010-606 |

Voto particular disidente emitido por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 17 de marzo de 2011

Disiento de la decisión que hoy toma una mayoría de los miembros de este Tribunal que rehúsa revisar la determinación del tribunal apelativo intermedio en este caso, en el cual se validó la acción legislativa de *descolegiar* la profesión legal en Puerto Rico. Ello supone incumplir con lo que es nuestra principal función como tribunal de última instancia: pautar el Derecho puertorriqueño. Pero más grave aún, la decisión de la mayoría rinde a los pies de la Asamblea Legislativa, nuestra prerrogativa centenaria de supervisar y regular la profesión legal. Con su "inacción", esa mayoría convalida una acción que cercena poderes inherentes de este

Tribunal. Con su "inacción", la mayoría valida una actuación de dudosa constitucionalidad.

Porque discrepo de este proceder, disiento del criterio mayoritario.

I

La Asamblea Legislativa, a la usanza de los gobernadores militares de finales del Siglo XIX, aprobó la Ley Núm. 121 de 13 de octubre de 2009 y la Ley Núm. 135 de 6 de noviembre de 2009, con el objetivo de derogar la colegiación compulsoria de los abogados en Puerto Rico desmembrando la organización centenaria que, con sus aciertos y desaciertos, le ha servido bien al país. Véase, Orden General Núm. 20 promulgada por el Gobernador Militar John R. Brooke en 1898.

El Colegio de Abogados de Puerto Rico ("el Colegio"), naturalmente, acudió el 22 de diciembre de 2009 ante el Tribunal de Primera Instancia cuestionando la constitucionalidad de ambas leyes. En esencia planteó lo siguiente: que los estatutos aprobados constituían leyes de proscripción contra el Colegio; usurpaban los poderes de esta Curia para reglamentar la profesión de la abogacía; violaban la separación de poderes, la libertad de expresión y de asociación del Colegio y sus miembros, así como la igual protección de las leyes; y que menoscababa la relación contractual entre el Colegio y los colegiados, entre otros asuntos. Posteriormente, el 19 de enero de 2010, el Colegio presentó una demanda enmendada y suplementaria en la cual expandió sus alegaciones fácticas. En el ínterin, la parte demandada y el interventor, Lcdo. John E. Mudd, habían

presentado sendas mociones de desestimación y sentencia sumaria. El foro primario había aceptado la demanda enmendada y se había negado a desestimarla.

Así las cosas, el interventor acudió ante el Tribunal de Apelaciones y solicitó que se paralizaran los procedimientos en instancia. Tras el Estado presentar su propio recurso de *certiorari*, el foro apelativo intermedio consolidó los recursos y paralizó los procedimientos en el Tribunal de Primera Instancia, y le ordenó a éste que fundamentara su negativa de desestimar la demanda presentada.

El foro primario emitió una resolución en cumplimiento de orden en la cual expuso las razones para denegar las mociones dispositivas presentadas por el demandado y el interventor. En síntesis, expresó que existían hechos en controversia y que una mera alegación a los efectos de que la parte demandante carecía de prueba para sustentar sus reclamos era insuficiente para desestimar la acción. Razonó que era necesario escuchar a las partes y examinar aquella evidencia que pudieran presentar los demandantes antes de tomar una determinación en el caso. Luego de que el foro apelativo intermedio ordenara una segunda resolución explicativa, el tribunal primario expuso que las mociones dispositivas se habían tornado inoficiosas pues éstas se presentaron contra la petición original de los demandantes y no fueron instadas nuevamente luego de que los demandantes presentaran su demanda enmendada. De igual forma, reiteró que era necesario brindar a los demandantes la oportunidad de

presentar su prueba para determinar si procedía el remedio de injunction.

El 18 de mayo de 2010, tras recibir los alegatos de las partes, el Tribunal de Apelaciones dictó sentencia mediante la cual revocó al foro primario. Aquél determinó que las mociones dispositivas podían atacar la demanda enmendada y que las controversias entre las partes eran estrictamente de derecho. Luego concluyó que los demandantes no tenían derecho a remedio alguno, ya que las Leyes Núm. 121 y 135, *supra*, sólo pretendían regular los procedimientos de una "criatura legislativa": el Colegio. Insatisfechos con la referida determinación, el Colegio de Abogados de Puerto Rico presentó ante esta Curia un recurso de *certiorari* el 12 de julio de 2010.

Debido a que considero que el presente recurso encierra controversias de gran envergadura para la profesión jurídica del país así como para el propio Tribunal, me parece incomprensible que una mayoría de este Tribunal haya determinado no considerar este recurso. Forzosamente tengo que disentir.

## II.

El caso ante nuestra consideración presenta asuntos de suma importancia que estimo merecen un examen detenido, sereno y objetivo por este Tribunal. Este no es el tipo de caso que debe resolverse mediante un "no ha lugar".[1]

---

[1] La "explicación" ofrecida en la Resolución certificada no refleja el dictamen razonado que ameritaba la controversia planteada en este caso.

En primer lugar, hoy debíamos examinar si la Asamblea Legislativa habría rebasado los contornos de sus poderes, afectando el delicado balance entre Ramas del Estado diseñado por nuestra Constitución, quebrantando, en ese proceso, nuestros precedentes en materia de separación de poderes. Entre otros, nos enfrentamos a una controversia sobre la usurpación por la Legislatura del poder inherente de la Rama Judicial para regular el ejercicio de la abogacía. *In re Reichard Hernández*, 2011 T.S.P.R. 8, págs. 6-7, 180 D.P.R. __ (2011). Ello ya que las Leyes Núm. 121 y 135, *supra*, eliminan la colegiación compulsoria que entendimos imprescindible hace décadas, como exigencia de ese poder inherente. *Véanse*, *Colegio de Abogados v. Schneider I*, 112 D.P.R. 540 (1982); *Colegio de Abogados v. Schneider II*, 117 D.P.R. 504 (1986).

De otra parte, estas leyes también exigen que este Foro promulgue cierta reglamentación bajo ciertos términos, así como también nos ordena cómo debemos manejar los fondos que podríamos recibir si decidimos establecer una cuota. De igual forma los estatutos impugnados, por ejemplo: disponen que si adoptamos dicha cuota, no podría ser mayor a $200.00; si tenemos a bien modificarla posteriormente, mandan a consignar las justificaciones para ello; establecen cómo han de identificarse los abogados ante los tribunales; nos ordenan notificar a todos los abogados sobre los efectos de las leyes en cuestión y a expedir tarjetas de identificación para los abogados que decidan no colegiarse. Estas "directrices", que se refieren a cómo debemos descargar

nuestro poder inherente para regular la profesión legal además de incidir directamente sobre nuestras prerrogativas sobre la administración de nuestros asuntos internos, se revela, como poco, de dudosa validez constitucional.

Por otro lado, hay que destacar que consideramos que la unidad institucional de abogados es presupuesto legítimo y necesario para el ejercicio de la profesión legal y ello se encuentra inmerso, y es consustancial con, el mandato de la Constitución que crea "un sistema judicial unificado en lo concerniente a jurisdicción, funcionamiento y administración". Art. V, Sec. 2, Const. E.L.A., 1 L.P.R.A. La eficiente administración de la Justicia es la aspiración que quedó plasmada en el Artículo V de la Constitución sobre el Poder Judicial. Le corresponde a esta Curia garantizarla para que este mandato deje de ser mero anhelo para convertirse en realidad. Este designio no tan solo fue un valor latente en las discusiones acaecidas durante los debates de la Convención Constituyente, sino que se recoge expresamente en el Informe que la Comisión de la Rama Judicial le presentó a la Convención Constituyente. 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, 1962, págs. 2608-14. *Véase*, *Colegio de Abogados de P.R. v. Schneider I*, *ante* (Negrón García, J., op. concurrente).

Con lo cual, no se requiere "mucha elucidación para comprender que la asociación compelida y la reglamentación de la profesión de abogados está inexorablemente atada a esa eficaz gestión *pro* la justicia. No es posible entonces divorciar una de la otra; *el sistema judicial integrado* es la

médula de la dinámica operacional constitucional y también va de la mano con el *régimen unificado de colegiación compulsoria.*" *Colegio de Abogados de P.R. v. Schneider I,* *ante,* pág. 558 (Negrón García, J., op. concurrente).

Hace un siglo, este Tribunal sostuvo que "[l]a misión de los abogados en la sociedad es altamente noble, pues están llamados a auxiliar a la recta administración de justicia. En ellos confían, no sólo las partes interesadas en los pleitos, sino las cortes mismas." *In re Díaz,* 16 D.P.R. 82, 92 (1910). En época reciente, al actualizar ese pensamiento centenario, indicamos que "la abogacía cumple una función social de notable importancia por su aportación imprescindible a la realización de la Justicia. El abogado, además de defensor de su cliente, es colaborador de la Justicia." *In re Hoffman Mouriño,* 170 D.P.R. 968, 980 (2007). Y es que la abogacía es un ejercicio de una actividad esencial para la realización de la justicia y los valores y principios constitucionales. Véase, Antonio Hernández Gil, *La Función Social del Abogado y la Abogacía,* Revista Abogados, febrero, 2008, pág. 35. Tan es así, que hemos expresado que "[l]a responsabilidad sobre la buena marcha del proceso judicial es compartida entre todos los estamentos que intervienen en estos procesos, por lo que es compromiso ineludible de todo abogado". *In re Dávila Toro,* res. el 30 de agosto 2010, 2010 T.S.P.R. 195, pág. 9, 179 D.P.R. ___ (2010). Todo lo cual nos lleva a cuestionarnos, con rigor, la validez constitucional de las leyes aprobadas por la

Asamblea Legislativa que minan la estabilidad del Colegio de Abogados.

Como si ello fuera poco, en el caso de autos debíamos determinar si las Leyes Núm. 121 y Núm. 135, *supra*, infringen derechos fundamentales del Colegio y sus miembros, como el derecho a la libertad de expresión y a la libre asociación cobijados por la Sección 4 del Artículo II de nuestra Constitución. Art. II, Sec. 4, Const. E.L.A., 1 L.P.R.A. Igualmente, el presente recurso nos brindaba la oportunidad de expresarnos en torno a si las leyes impugnadas constituyen legislación de proscripción (*bills of attainder*), prohibidas bajo la Constitución de Estados Unidos. Art. I, Sec. 9, Const. E.U.A. Este tipo de leyes están vedadas ya que representan castigos impuestos por la Legislatura sin que los tribunales realicen un juicio. *U.S. v. Brown*, 381 U.S. 437 (1965); *Cummings v. Missouri*, 71 U.S. 277 (1866). Ello no obstante, la mayoría desoye estos reclamos y se niega permitirle al Colegio presentar prueba para sustentar sus reclamos constitucionales. En correcta técnica adjudicativa, ello era necesario para sustentar varios de los reclamos de índole constitucional presentados por el Colegio de Abogados.

Es evidente que las Leyes Núm. 121 y Núm. 135, *ante,* afectan sustancialmente la organización del Colegio y las funciones de esta Curia. A su vez, levantan controversias trascendentales de talante constitucional. Empero, hoy la mayoría del Tribunal rechaza enfrentarse a las interrogantes antes reseñadas. No puedo suscribir con mi voto tal proceder.

Era necesario atender el presente recurso. Se trata de reclamos serios elaborados por una de las instituciones más antiguas de nuestro país, la cual ha puesto todo su empeño en promover el mejor bienestar de los miembros de la clase togada y la protección de los derechos de la población en general; haciendo realidad el valor que postula que la abogacía es antes, sustancia social, que formalismo jurídico. Hernández Gil, *ante*. Basta recordar algunos de nuestros pasados pronunciamientos:

> El Colegio de Abogados ha cumplido adecuadamente las obligaciones que le impuso la ley que lo creó. Ha contribuido al mejoramiento de la administración de la justicia; ha formulado informes; ha contestado consultas reclamadas por el Gobierno; ha defendido con celo los derechos e inmunidades de los abogados procurando que éstos gocen ante los tribunales de la libertad necesaria para el buen desempeño de su profesión; ha promovido relaciones fraternales entre sus miembros, y ha velado por el sostenimiento de una saludable moral profesional entre los colegiados. También ha contribuido a enriquecer la vida intelectual de los abogados y ha fortalecido la aspiración colectiva a una sociedad democrática al amparo de la ley.
>
> El Colegio es una entidad democrática. Su Presidente, su Junta de Gobierno y las directivas de las Delegaciones son electos en asambleas que garantizan a todos los colegiados la participación, libre expresión y el derecho a presentar y debatir resoluciones. En la asamblea anual se aprueba el presupuesto de la institución. La vida institucional propicia la participación abierta y la tolerancia.
>
> La institución ha alentado la libertad de expresión entre sus colegiados y entre los ciudadanos. Mediante el pago de un canon preestablecido permite el uso de algunos de sus recursos físicos a toda persona, natural o jurídica, que interese ejercer la libertad de expresión garantizada por las disposiciones constitucionales aplicables. Por reglamento, exime de dicho canon a determinadas instituciones íntimamente relacionadas con las funciones que le han sido encomendadas al Colegio, principalmente compuestas por abogados o estudiantes de derecho.

> Como foro libre para la profesión y para la comunidad el Colegio ha propiciado exhibiciones artísticas, artesanales y, en síntesis, ha contribuido a mejorar la calidad de la vida. La institución juega un papel importante en el desarrollo vital del país.
>
> . . . .
>
> En resumen, el estudio de la prueba revela la multidimensionalidad de las actividades del Colegio y en casi su totalidad su íntima relación con la profesión y fines y propósitos del Colegio.

*Colegio de Abogados v. Schneider II*, *ante*, págs. 513-18.

Al concluir,[2] hago mías expresiones del Juez Asociado señor Negrón García en *Colegio de Abogados v. Schneider, I, ante*, págs. 559-60, las cuales, sin duda, no han perdido su vigencia con el transcurso del tiempo: "Como toda institución humana el Colegio de Abogados no es infalible. Las fallas del pasado o recientes en que haya podido incurrir, el desagrado de algunos de sus miembros a sus pronunciamientos públicos, no . . . **son razones de peso suficientes para la destrucción de una institución de hondo arraigo en la sociedad puertorriqueña, que históricamente se ha distinguido como foro abierto de libertad y en la protección de innumerables causas meritorias.**" (Énfasis suplido).

Deberíamos todos dedicarnos a construir –no a abatir para extinguir– instituciones que le sirven bien no sólo a los miembros de su gremio, sino a la sociedad en general ofreciendo espacios para la discusión libre, abierta y enriquecedora de los distintos asuntos que se dilucidan en el país; que actúa como fuerza de defensa de los derechos en

---

[2] Aclaro que sólo he esbozado algunas de las controversias que se plantean en este caso.

todos los aspectos de la vida social, cultural y política, y no al margen de ellos. De esta forma se fortalece y crece toda sociedad que se presuma madura, democrática y plural.

Porque en esto creo, estoy compelida a disentir del criterio de la mayoría.


Anabelle Rodríguez Rodríguez
Juez Asociada